[No. S070296. Aug. 9, 1999.]

GERTRUDE M. LAMDEN, Plaintiff and Appellant, v.
LA JOLLA SHORES CLUBDOMINIUM HOMEOWNERS
ASSOCIATION, Defendant and Respondent.

250

### COUNSEL

Robert H. Lynn for Plaintiff and Appellant.

Mayfield & Associates and Gayle J. Mayfield for Common Interest Consumer Project as Amicus Curiae on behalf of Plaintiff and Appellant.

Robie & Matthai, James R. Robie, Kyle Kveton, Pamela E. Dunn, Claudia M. Sokol and Daniel J. Koes for Defendant and Respondent.

Weintraub Genshlea & Sproul, Curtis C. Sproul; Farmer, Weber & Case, John T. Farmer, Kimberly F. Rich; Even, Crandall, Wade, Lowe & Gates, Edwin B. Brown; Peters & Freedman, Simon J. Freedman and James R. McCormick, Jr., as Amici Curiae on behalf of Defendant and Respondent.

Hazel & Thomas, Michael A. Banzhaf, Robert M. Diamond and Michael S. Dingman for Community Associations Institute as Amicus Curiae on behalf of Defendant and Respondent.

Early, Maslach, Price & Baukol and Priscilla F. Slocum for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant and Respondent.

Martin, Wilson & MacDowell, Scott A. Martin, John R. MacDowell and Steven S. Wang for Desert Falls Homeowners Association and Upland Hills Country Club Condominium Association as Amici Curiae on behalf of Defendant and Respondent.

June Babiracki Barlow and Neil D. Kalin for California Association of Realtors as Amicus Curiae on behalf of Defendant and Respondent.

### OPINION

**WERDEGAR, J.**—A building in a condominium development suffered from termite infestation. The board of directors of the development's community association[1] decided to treat the infestation locally ("spot-treat"), rather than fumigate. Alleging the board's decision diminished the value of

---

[1] In 1985, the Legislature enacted the Davis-Stirling Common Interest Development Act (Davis-Stirling Act) as division 2, part 4, title 6 of the Civil Code, "Common Interest

her unit, the owner of a condominium in the development sued the community association. In adjudicating her claims, under what standard should a court evaluate the board's decision?

As will appear, we conclude as follows: Where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise. Thus, we adopt today for California courts a rule of judicial deference to community association board decisionmaking that applies, regardless of an association's corporate status, when owners in common interest developments seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors. (Cf. *Levandusky* v. *One Fifth Ave. Apt. Corp.* (1990) 75 N.Y.2d 530, 537-538 [554 N.Y.S.2d 807, 811, 557 N.E.2d 1317, 1321] [analogizing a similarly deferential rule to the common law "business judgment rule"].)

Accordingly, we reverse the judgment of the Court of Appeal.

BACKGROUND

Plaintiff Gertrude M. Lamden owns a condominium unit in one of three buildings comprising the La Jolla Shores Clubdominium condominium development (Development).[2] Over some years, the board of governors (Board) of defendant La Jolla Shores Clubdominium Homeowners Association (Association), an unincorporated community association, elected to spot-treat (secondary treatment), rather than fumigate (primary treatment), for termites the building in which Lamden's unit is located (Building Three).

In the late 1980's, attempting to remedy water intrusion and mildew damage, the Association hired a contractor to renovate exterior siding on all three buildings in the Development. The contractor replaced the siding on

---

Developments" (Civ. Code, §§ 1350-1376; Stats. 1985, ch. 874, § 14, pp. 2774-2787), which encompasses community apartment projects, condominium projects, planned developments and stock cooperatives (Civ. Code, § 1351, subd. (c)). "A common interest development shall be managed by an association which may be incorporated or unincorporated. The association may be referred to as a community association." (Civ. Code, § 1363, subd. (a).)

[2]The Development was built, and its governing declaration of restrictions recorded, in 1971. In 1973 Lamden and her husband bought unit 375, one of 42 units in the complex's largest building. Until 1977 the Lamdens used their unit only as a rental. From 1977 until 1988 they lived in the unit; since 1988 the unit has again been used only as a rental.

the southern exposure of Building Three and removed damaged drywall and framing. Where the contractor encountered termites, a termite extermination company provided spot-treatment and replaced damaged material.

Lamden remodeled the interior of her condominium in 1990. At that time, the Association's manager arranged for a termite extermination company to spot-treat areas where Lamden had encountered termites.

The following year, both Lamden and the Association obtained termite inspection reports recommending fumigation, but the Association's Board decided against that approach. As the Court of Appeal explained, the Board based its decision not to fumigate on concerns about the cost of fumigation, logistical problems with temporarily relocating residents, concern that fumigation residue could affect residents' health and safety, awareness that upcoming walkway renovations would include replacement of damaged areas, pet moving expenses, anticipated breakage by the termite company, lost rental income and the likelihood that termite infestation would recur even if primary treatment were utilized. The Board decided to continue to rely on secondary treatment until a more widespread problem was demonstrated.

In 1991 and 1992, the Association engaged a company to repair water intrusion damage to four units in Building Three. The company removed siding in the balcony area, repaired and waterproofed the decks, and repaired joints between the decks and the walls of the units. The siding of the unit below Lamden's and one of its walls were repaired. Where termite infestation or damage became apparent during this project, spot-treatment was applied and damaged material removed.

In 1993 and 1994, the Association commissioned major renovation of the Development's walkway system, the underpinnings of which had suffered water and termite damage. The $1.6 million walkway project was monitored by a structural engineer and an on-site architect.

In 1994, Lamden brought this action for damages, an injunction and declaratory relief. She purported to state numerous causes of action based on the Association's refusal to fumigate for termites, naming as defendants certain individual members of the Board as well as the Association. Her amended complaint included claims sounding in breach of contract (viz., the governing declaration of restrictions [Declaration]), breach of fiduciary duty, and negligence. She alleged that the Association, in opting for secondary over primary treatment, had breached Civil Code section 1364, subdivision

(b)(1)[3] and the Declaration[4] in failing adequately to repair, replace and maintain the common areas of the Development.

Lamden further alleged that, as a proximate result of the Association's breaching its responsibilities, she had suffered diminution in the value of her condominium unit, repair expenses, and fees and costs in connection with this litigation. She also alleged that the Association's continued breach had caused and would continue to cause her irreparable harm by damaging the structural integrity and soundness of her unit, and that she has no adequate remedy at law. At trial, Lamden waived any damages claims and dismissed with prejudice the individual defendants. Presently, she seeks only an injunction and declaratory relief.

After both sides had presented evidence and argument, the trial court rendered findings related to the termite infestation affecting plaintiff's condominium unit, its causes, and the remedial steps taken by the Association. The trial court found there was "no question from all the evidence that Mrs. Lamden's unit . . . has had a serious problem with termites." In fact, the trial court found, "The evidence . . . was overwhelming that termites had been a problem over the past several years." The court concluded, however, that while "there may be active infestation" that would require "steps [to be] taken within the future years," there was no evidence that the condominium units were in imminent structural danger or "that these units are about to fall or something is about to happen."

The trial court also found that, "starting in the late '80's," the Association had arranged for "some work" addressing the termite problem to be done. Remedial and investigative work ordered by the Association included, according to the trial court, removal of siding to reveal the extent of damage, a "big project . . . in the early '90's," and an architect's report on building design factors. According to the court, the Board "did at one point seriously consider" primary treatment; "they got a bid for this fumigation, and there was discussion." The court found that the Board also considered possible problems entailed by fumigation, including relocation costs, lost rent, concerns about pets and plants, human health issues and eventual termite reinfestation.

---

[3]As discussed more fully *post*, "In a community apartment project, condominium project, or stock cooperative . . . unless otherwise provided in the declaration, the association is responsible for the repair and maintenance of the common area occasioned by the presence of wood-destroying pests or organisms." (Civ. Code, § 1364, subd. (b)(1).)

[4]The Declaration, which contains the Development's governing covenants, conditions, and restrictions (CC&R's), states that the Association was to provide for the management, maintenance, repair and preservation of the complex's common areas for the enhancement of the value of the project and each unit and for the benefit of the owners.

As to the causes of the Development's termite infestation, the trial court concluded that "the key problem came about from you might say a poor design" and resulting "water intrusion." In short, the trial court stated, "the real culprit is not so much the Board, but it's the poor design and the water damage that is conducive to bringing the termites in."

As to the Association's actions, the trial court stated, "the Board did take appropriate action." The court noted the Board "did come up with a plan," viz., to engage a pest control service to "come out and [spot] treat [termite infestation] when it was found." The trial judge opined he might, "from a personal relations standpoint," have acted sooner or differently under the circumstances than did the Association, but nevertheless concluded "the Board did have a rational basis for their decision to reject fumigation, and do . . . what they did." Ultimately, the court gave judgment for the Association, applying what it called a "business judgment test." Lamden appealed.

Citing *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] (*Frances T.*), the Court of Appeal agreed with Lamden that the trial court had applied the wrong standard of care in assessing the Association's actions. In the Court of Appeal's view, relevant statutes, the governing Declaration and principles of common law imposed on the Association an objective duty of reasonable care in repairing and maintaining the Development's common areas near Lamden's unit as occasioned by the presence of termites. The court also concluded that, had the trial court analyzed the Association's actions under an objective standard of reasonableness, an outcome more favorable to Lamden likely would have resulted. Accordingly, the Court of Appeal reversed the judgment of the trial court.

We granted the Association's petition for review.

## DISCUSSION

"In a community apartment project, condominium project, or stock cooperative . . . unless otherwise provided in the declaration, the association is responsible for the repair and maintenance of the common area occasioned by the presence of wood-destroying pests or organisms." (Civ. Code, § 1364, subd. (b)(1).) The Declaration in this case charges the Association with "management, maintenance and preservation" of the Development's common areas. Further, the Declaration confers upon the Board power and authority to maintain and repair the common areas. Finally, the Declaration provides that "limitations, restrictions, conditions and covenants set forth in this Declaration constitute a general scheme for (i) the maintenance, protection and enhancement of value of the Project and all Condominiums and (ii) the benefit of all Owners."

In light of the foregoing, the parties agree the Association is responsible for the repair and maintenance of the Development's common areas occasioned by the presence of termites. They differ only as to the standard against which the Association's performance in discharging this obligation properly should be assessed: a deferential "business judgment" standard or a more intrusive one of "objective reasonableness."

The Association would have us decide this case through application of "the business judgment rule." As we have observed, that rule of judicial deference to corporate decisionmaking "exists in one form or another in every American jurisdiction." (*Frances T., supra*, 42 Cal.3d at p. 507, fn. 14.)

"The common law business judgment rule has two components— one which immunizes [corporate] directors from personal liability if they act in accordance with its requirements, and another which insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest." (*Lee* v. *Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 714 [57 Cal.Rptr.2d 798], citing 2 Marsh & Finkle, Marsh's Cal. Corporation Law (3d ed., 1996 supp.) § 11.3, pp. 796-797.) A hallmark of the business judgment rule is that, when the rule's requirements are met, a court will not substitute its judgment for that of the corporation's board of directors. (See generally, *Katz* v. *Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366 [27 Cal.Rptr.2d 681].) As discussed more fully below, in California the component of the common law rule relating to directors' personal liability is defined by statute. (See Corp. Code, §§ 309 [profit corporations], 7231 [nonprofit corporations].)

According to the Association, uniformly applying a business judgment standard in judicial review of community association board decisions would promote certainty, stability and predictability in common interest development governance. Plaintiff, on the other hand, contends general application of a business judgment standard to board decisions would undermine individual owners' ability, under Civil Code section 1354, to enforce, as equitable servitudes, the CC&R's in a common interest development's declaration.[5] Stressing residents' interest in a stable and predictable living environment, as embodied in a given development's particular CC&R's,

---

[5]Civil Code section 1354, subdivision (a) provides: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both."

plaintiff encourages us to impose on community associations an objective standard of reasonableness in carrying out their duties under governing CC&R's or public policy.

For at least two reasons, what we previously have identified as the "business judgment rule" (see *Frances T., supra,* 42 Cal.3d at p. 507 [discussing Corporations Code section 7231] and fn. 14 [general discussion of common law rule]; *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770] [reference to common law rule]) does not directly apply to this case. First, the statutory protections for individual directors (Corp. Code, §§ 309, subd. (c), 7231, subd. (c)) do not apply, as no individual directors are defendants here.

Corporations Code sections 309 and 7231 (section 7231) are found in the General Corporation Law (Corp. Code, § 100 et seq.) and the Nonprofit Corporation Law (*id.,* § 5000 et seq.), respectively; the latter incorporates the standard of care defined in the former (*Frances T., supra,* 42 Cal.3d at p. 506, fn. 13, citing legis. committee com., Deering's Ann. Corp. Code (1979 ed.) foll. § 7231, p. 205; 1B Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 406.01, p. 19-192). Section 7231 provides, in relevant part: "A director shall perform the duties of a director . . . in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (§ 7231, subd. (a); cf. Corp. Code, § 309, subd. (a).) "A person who performs the duties of a director in accordance with [the stated standards] shall have no liability based upon any alleged failure to discharge the person's obligations as a director . . . ." (§ 7231, subd. (c); cf. Corp. Code, § 309, subd. (c).)

Thus, by its terms, section 7231 protects only "[a] *person* who performs the duties of a director" (§ 7231, subd. (c), italics added); it contains no reference to the component of the common law business judgment rule that somewhat insulates ordinary corporate business *decisions,* per se, from judicial review. (See generally, *Lee* v. *Interinsurance Exchange, supra,* 50 Cal.App.4th at p. 714, citing 2 Marsh & Finkle, Marsh's Cal. Corporation Law, *supra,* § 11.3, pp. 796-797.) Moreover, plaintiff here is seeking only injunctive and declaratory relief, and it is not clear that such a prayer implicates section 7231. The statute speaks only of protection against "*liability* based upon any alleged failure to discharge the person's obligations . . . ." (§ 7231, subd. (c), italics added.)

As no compelling reason for departing therefrom appears, we must construe section 7231 in accordance with its plain language. (*Rossi* v. *Brown*

(1995) 9 Cal.4th 688, 694 [38 Cal.Rptr.2d 363, 889 P.2d 557]; *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216]; *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) It follows that section 7231 cannot govern for present purposes.

Second, neither the California statute nor the common law business judgment rule, strictly speaking, protects *noncorporate* entities, and the defendant in this case, the Association, is not incorporated.[6]

 Traditionally, our courts have applied the common law "business judgment rule" to shield from scrutiny qualifying decisions made by a *corporation's* board of directors. (See, e.g., *Marsili* v. *Pacific Gas & Elec. Co.* (1975) 51 Cal.App.3d 313, 324 [124 Cal.Rptr. 313, 79 A.L.R.3d 477]; *Fairchild* v. *Bank of America* (1961) 192 Cal.App.2d 252, 256-257 [13 Cal.Rptr. 491]; *Findley* v. *Garrett* (1952) 109 Cal.App.2d 166, 174-175 [240 P.2d 421]; *Duffey* v. *Superior Court* (1992) 3 Cal.App.4th 425, 429 [4 Cal.Rptr.2d 334] [rule applied to decision by board of *incorporated* community association]; *Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 865 [137 Cal.Rptr. 528] [same].) The policies underlying judicial creation of the common law rule derive from the realities of business in the corporate context. As we previously have observed: "The business judgment rule has been justified primarily on two grounds. First, that directors should be given wide latitude in their handling of corporate affairs because the hindsight of the judicial process is an imperfect device for evaluating business decisions. Second, '[t]he rule recognizes that shareholders to a very real degree voluntarily undertake the risk of bad business judgment; investors need not buy stock, for investment markets offer an array of opportunities less vulnerable to mistakes in judgment by corporate officers.'" (*Frances T., supra*, 42 Cal.3d at p. 507, fn. 14, quoting 18B Am.Jur.2d (1985) Corporations, § 1704, pp. 556-557; see also *Findley* v. *Garrett, supra*, 109 Cal.App.2d at p. 174.)

 California's statutory business judgment rule contains no express language extending its protection to noncorporate entities or actors. Section

---

[6]The parties do not dispute that the component of the common law business judgment rule calling for deference to corporate decisions survives the Legislature's codification, in section 7231, of the component shielding individual directors from liability. (See also *Lee* v. *Interinsurance Exchange, supra*, 50 Cal.App.4th at p. 714; see generally, *California Assn. of Health Facilities* v. *Department of Health Services* (1997) 16 Cal.4th 284, 297 [65 Cal.Rptr.2d 872, 940 P.2d 323] [unless expressly provided, statutes should not be interpreted to alter the common law]; *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 80 [276 Cal.Rptr. 130, 801 P.2d 373] ["statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject"].)

7231, as noted, is part of our Corporations Code and, by its terms, protects only "director[s]." In the Corporations Code, except where otherwise expressly provided, "directors" means "natural persons" designated, elected or appointed "to act as members of the governing body of the corporation." (Corp. Code, § 5047.)

Despite this absence of textual support, the Association invites us for policy reasons to construe section 7231 as applying both to incorporated and unincorporated community associations. (See generally, Civ. Code, § 1363, subd. (a) [providing that a common interest development "shall be managed by an association which may be incorporated or unincorporated"]; *id.*, subd. (c) ["Unless the governing documents provide otherwise," the association, whether incorporated or unincorporated, "may exercise the powers granted to a nonprofit mutual benefit corporation, as enumerated in Section 7140 of the Corporations Code."]; *Oil Workers Intl. Union* v. *Superior Court* (1951) 103 Cal.App.2d 512, 571 [230 P.2d 71], quoting *Otto* v. *Tailors' P. & B. Union* (1888) 75 Cal. 308, 313 [17 P. 217] [when courts take jurisdiction over unincorporated associations for the purpose of protecting members' property rights, they " 'will follow and enforce, so far as applicable, the rules applying to incorporated bodies of the same character' "]; *White* v. *Cox* (1971) 17 Cal.App.3d 824, 828 [95 Cal.Rptr. 259, 45 A.L.R.3d 1161] [noting that "unincorporated associations are now entitled to general recognition as separate legal entities"].) Since other aspects of this case—apart from the Association's corporate status—render section 7231 inapplicable, anything we might say on the question of the statute's broader application would, however, be dictum. Accordingly, we decline the Association's invitation to address the issue.

For the foregoing reasons, the "business judgment rule" of deference to corporate decisionmaking, at least as we previously have understood it, has no direct application to the instant controversy. The precise question presented, then, is whether we should in this case adopt for California courts a rule—analogous perhaps to the business judgment rule—of judicial deference to community association board decisionmaking that would apply, regardless of an association's corporate status, when owners in common interest developments seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors. (Cf. *Levandusky* v. *One Fifth Ave. Apt. Corp.*, *supra*, 75 N.Y.2d at p. 538 [554 N.Y.S.2d at p. 811] [referring "for the purpose of analogy only" to the business judgment rule in adopting a rule of deference].)

Our existing jurisprudence specifically addressing the governance of common interest developments is not voluminous. While we have not previously

examined the question of what standard or test generally governs judicial review of decisions made by the board of directors of a community association, we have examined related questions.

Fifty years ago, in *Hannula v. Hacienda Homes* (1949) 34 Cal.2d 442 [211 P.2d 302, 19 A.L.R.2d 1268], we held that the decision by the board of directors of a real estate development company to deny, under a restrictive covenant in a deed, the owner of a fractional part of a lot permission to build a dwelling thereon "must be a reasonable determination made in good faith." (*Id.* at p. 447, citing *Parsons v. Duryea* (1927) 261 Mass. 314, 316 [158 N.E. 761, 762]; *Jones v. Northwest Real Estate Co.* (1925) 149 Md. 271, 278 [131 A. 446, 449]; *Harmon v. Burow* (1919) 263 Pa. 188, 190 [106 A. 310, 311].) Sixteen years ago, we held that a condominium owners association is a "business establishment" within the meaning of the Unruh Civil Rights Act, section 51 of the Civil Code. (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 796 [191 Cal.Rptr. 320, 662 P.2d 427]; but see *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175 [278 Cal.Rptr. 614, 805 P.2d 873] [declining to extend *O'Connor*]; *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 697 [72 Cal.Rptr.2d 410, 952 P.2d 218] [same].) And 10 years ago, in *Frances T., supra*, 42 Cal.3d 490, we considered "whether a condominium owners association and the individual members of its board of directors may be held liable for injuries to a unit owner caused by third-party criminal conduct." (*Id.* at p. 495.)

In *Frances T.*, a condominium owner, who resided in her unit, brought an action against the community association, a nonprofit corporation, and the individual members of its board of directors after she was raped and robbed in her dwelling. She alleged negligence, breach of contract and breach of fiduciary duty, based on the association's failure to install sufficient exterior lighting and its requiring her to remove additional lighting that she had installed herself. The trial court sustained the defendants' general demurrers to all three causes of action. (*Frances T., supra*, 42 Cal.3d at p. 495.) We reversed. A community association, we concluded, may be held to a landlord's standard of care as to residents' safety in the common areas (*id.* at pp. 499-500), and the plaintiff had alleged particularized facts stating a cause of action against both the association and the individual members of the board (*id.* at p. 498). The plaintiff failed, however, to state a cause of action for breach of contract, as neither the development's governing CC&R's nor the association's bylaws obligated the defendants to install additional lighting. The plaintiff failed likewise to state a cause of action for breach of fiduciary duties, as the defendants had fulfilled their duty to the plaintiff as a shareholder, and the plaintiff had alleged no facts to show that

the association's board members had a fiduciary duty to serve as the condominium project's landlord. (*Id.* at pp. 512-514.)

In discussing the scope of a condominium owners association's common law duty to a unit owner, we observed in *Frances T.* that "the Association is, for all practical purposes, the Project's 'landlord.' " (*Frances T., supra,* 42 Cal.3d at p. 499, fn. omitted.) And, we noted, "traditional tort principles impose on landlords, no less than on homeowner associations that function as a landlord in maintaining the common areas of a large condominium complex, a duty to exercise due care for the residents' safety in those areas under their control." (*Ibid.,* citing *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324, 328 [176 Cal.Rptr. 494]; *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 802-803 [142 Cal.Rptr. 487]; *Kline* v. *1500 Massachusetts Avenue Apartment Corp.* (1970) 439 F.2d 477, 480-481 [141 App.D.C. 370, 43 A.L.R.3d 311]; *Scott* v. *Watson* (1976) 278 Md. 160 [359 A.2d 548, 552].) We concluded that "under the circumstances of this case the Association should be held to the same standard of care as a landlord." (*Frances T., supra,* 42 Cal.3d at p. 499; see also *id.* at pp. 499-501, relying on *O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 796 ["association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders"] and *White* v. *Cox, supra,* 17 Cal.App.3d at p. 830 [association, as management body over which individual owner has no effective control, may be sued for negligence in maintaining sprinkler].)

More recently, in *Nahrstedt* v. *Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 375 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*), we confronted the question, "When restrictions limiting the use of property within a common interest development satisfy the requirements of covenants running with the land or of equitable servitudes, what standard or test governs their enforceability?"[7]

In *Nahrstedt,* an owner of a condominium unit who had three cats sued the community association, its officers and two of its employees for declaratory relief, seeking to prevent the defendants from enforcing against

---

[7]Our opinion in *Nahrstedt* also contains extensive background discussion, which need not be reproduced here. *Nahrstedt*'s background materials discuss the origin and development of condominiums, cooperatives and planned unit developments as widely accepted forms of real property ownership (*Nahrstedt, supra,* 8 Cal.4th at pp. 370-375, citing numerous authorities); California's statutory scheme governing condominiums and other common interest developments (*id.* at pp. 377-379 [describing the Davis-Stirling Act]); and general property law principles respecting equitable servitudes and their enforcement (*Nahrstedt, supra,* at pp. 380-382).

her a prohibition on keeping pets that was contained in the community association's recorded CC&R's. In resolving the dispute, we distilled from numerous authorities the principle that "[a]n equitable servitude will be enforced unless it violates public policy; it bears no rational relationship to the protection, preservation, operation or purpose of the affected land; or it otherwise imposes burdens on the affected land that are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced." (*Nahrstedt, supra,* 8 Cal.4th at p. 382.) Applying this principle, and noting that a common interest development's recorded use restrictions are "enforceable equitable servitudes, unless unreasonable" (Civ. Code, § 1354, subd. (a)), we held that "such restrictions should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit" (*Nahrstedt, supra,* at p. 382). (See also *Citizens for Covenant Compliance* v. *Anderson* (1995) 12 Cal.4th 345, 349 [47 Cal.Rptr.2d 898, 906 P.2d 1314] [previously recorded restriction on property use in common plan for ownership of subdivision property enforceable even if not cited in deed at time of sale].)

In deciding *Nahrstedt,* we noted that ownership of a unit in a common interest development ordinarily "entails mandatory membership in an owners association, which, through an elected board of directors, is empowered to enforce any use restrictions contained in the project's declaration or master deed and to enact new rules governing the use and occupancy of property within the project." (*Nahrstedt, supra,* 8 Cal.4th at p. 373, citing Cal. Condominium and Planned Development Practice (Cont.Ed.Bar 1984) § 1.7, p. 13; Note, *Community Association Use Restrictions: Applying the Business Judgment Doctrine* (1988) 64 Chi.-Kent L.Rev. 653; Natelson, Law of Property Owners Associations (1989) § 3.2.2, p. 71 et seq.) "Because of its considerable power in managing and regulating a common interest development," we observed, "the governing board of an owners association must guard against the potential for the abuse of that power." (*Nahrstedt, supra,* at pp. 373-374, fn. omitted.) We also noted that a community association's governing board's power to regulate "pertains to a 'wide spectrum of activities,' such as the volume of playing music, hours of social gatherings, use of patio furniture and barbecues, and rental of units." (*Id.* at p. 374, fn. 6.)

We declared in *Nahrstedt* that, "when an association determines that a unit owner has violated a use restriction, the association must do so in good faith, not in an arbitrary or capricious manner, and its enforcement procedures must be fair and applied uniformly." (*Nahrstedt, supra,* 8 Cal.4th at p. 383,

citing *Ironwood Owners Assn. IX* v. *Solomon* (1986) 178 Cal.App.3d 766, 772 [224 Cal.Rptr. 18]; *Cohen* v. *Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 650 [191 Cal.Rptr. 209].) Nevertheless, we stated, "Generally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy." (*Nahrstedt, supra,* at p. 374, citing Natelson, *Consent, Coercion, and "Reasonableness" in Private Law: The Special Case of the Property Owners Association* (1990) 51 Ohio State L.J. 41, 43.)

The plaintiff in this case, like the plaintiff in *Nahrstedt,* owns a unit in a common interest development and disagrees with a particular aspect of the development's overall governance as it has impacted her. Whereas the restriction at issue in *Nahrstedt* (a ban on pets), however, was promulgated at the development's inception and enshrined in its founding CC&R's, the decision plaintiff challenges in this case (the choice of secondary over primary termite treatment) was promulgated by the Association's Board long after the Development's inception and after plaintiff had acquired her unit. Our holding in *Nahrstedt,* which established the standard for judicial review of recorded use restrictions that satisfy the requirements of covenants running with the land or equitable servitudes (see *Nahrstedt, supra,* 8 Cal.4th at p. 375), therefore, does not directly govern this case, which concerns the standard for judicial review of discretionary economic decisions made by the governing boards of community associations.

In *Nahrstedt,* moreover, some of our reasoning arguably suggested a distinction between originating CC&R's and subsequently promulgated use restrictions. Specifically, we reasoned in *Nahrstedt* that giving deference to a development's originating CC&R's "protects the general expectations of condominium owners 'that restrictions in place at the time they purchase their units will be enforceable.'" (*Nahrstedt, supra,* 8 Cal.4th at p. 377, quoting Note, *Judicial Review of Condominium Rulemaking* (1981) 94 Harv. L.Rev. 647, 653.) Thus, our conclusion that judicial review of a common interest development's founding CC&R's should proceed under a deferential standard was, as plaintiff points out, at least partly derived from our understanding (invoked there by way of contrast) that the factors justifying such deference will not *necessarily* be present when a court considers subsequent, unrecorded community association board decisions. (See *Nahrstedt, supra,* at pp. 376-377, discussing *Hidden Harbour Estates* v. *Basso* (Fla.Dist.Ct.App. 1981) 393 So.2d 637, 639-640.)

Nevertheless, having reviewed the record in this case, and in light of the foregoing authorities, we conclude that the Board's decision here to

use secondary, rather than primary, treatment in addressing the Development's termite problem, a matter entrusted to its discretion under the Declaration and Civil Code section 1364, falls within *Nahrstedt*'s pronouncement that "Generally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy." (*Nahrstedt, supra,* 8 Cal.4th at p. 374.) Moreover, our deferring to the Board's discretion in this matter, which, as previously noted, is broadly conferred in the Development's CC&R's, is consistent with *Nahrstedt*'s holding that CC&R's "should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit." (*Id.* at p. 382.)

Here, the Board exercised discretion clearly within the scope of its authority under the Declaration and governing statutes to select among means for discharging its obligation to maintain and repair the Development's common areas occasioned by the presence of wood-destroying pests or organisms. The trial court found that the Board acted upon reasonable investigation, in good faith, and in a manner the Board believed was in the best interests of the Association and its members. (See generally, *Nahrstedt, supra,* 8 Cal.4th at p. 374; *Frances T., supra,* 42 Cal.3d at pp. 512-514 [association's refusal to install lighting breached no contractual or fiduciary duties]; *Hannula v. Hacienda Homes, supra,* 34 Cal.2d at p. 447 ["refusal to approve plans must be a reasonable determination made in good faith"].)

Contrary to the Court of Appeal, we conclude the trial court was correct to defer to the Board's decision. We hold that, where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise.

The foregoing conclusion is consistent with our previous pronouncements, as reviewed above, and also with those of California courts, generally, respecting various aspects of association decisionmaking. (See *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550 [116 Cal.Rptr. 245, 526 P.2d 253] [holding "whenever a private association is legally required to refrain from arbitrary action, the association's action must be substantively rational and procedurally fair"]; *Ironwood Owners Assn. IX*

v. *Solomon, supra,* 178 Cal.App.3d at p. 772 [holding homeowners association seeking to enforce CC&R's and compel act by member owner must "show that it has followed its own standards and procedures prior to pursuing such a remedy, that those procedures were fair and reasonable and that its substantive decision was made in good faith, and is reasonable, not arbitrary or capricious"]; *Cohen* v. *Kite Hill Community Assn., supra,* 142 Cal.App.3d at p. 650 [noting "a settled rule of law that homeowners associations must exercise their authority to approve or disapprove an individual homeowner's construction or improvement plans in conformity with the declaration of covenants and restrictions, and in good faith"]; *Laguna Royale Owners Assn.* v. *Darger* (1981) 119 Cal.App.3d 670, 683-684 [174 Cal.Rptr. 136] [in purporting to test "reasonableness" of owners association's refusal to permit transfer of interest, court considered "whether the reason for withholding approval is rationally related to the protection, preservation or proper operation of the property and the purposes of the Association as set forth in its governing instruments" and "whether the power was exercised in a fair and nondiscriminatory manner"].)[8]

Our conclusion also accords with our recognition in *Frances T.* that the relationship between the individual owners and the managing association of a common interest development is complex. (*Frances T., supra,* 42 Cal.3d at pp. 507-509; see also *Duffey* v. *Superior Court, supra,* 3 Cal.App.4th at pp. 428-429 [noting courts "analyze homeowner associations in different ways, depending on the function the association is fulfilling under the facts of each case" and citing examples]; *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 844 [182 Cal.Rptr. 813]; *O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 796; *Beehan* v. *Lido Isle Community Assn., supra,* 70 Cal.App.3d at pp. 865-867.) On the one hand, each individual owner has an economic interest in the proper business management of the development as a whole for the sake of maximizing the value of his or her investment. In this aspect, the relationship between homeowner and association is somewhat analogous to that between shareholder and corporation. On the other hand, each individual owner, at least while residing in the development, has a personal, not strictly economic,

[8]Courts in other jurisdictions have adopted similarly deferential rules. (See, e.g., *Levandusky* v. *One Fifth Ave. Apt. Corp., supra,* 75 N.Y.2d at p. 538 [554 N.Y.S.2d at p. 812, 553 N.E.2d at pp. 1321-1322] [comparing benefits of a "reasonableness" standard with those of a "business judgment rule" and holding that, when "the board acts for the purposes of the cooperative, within the scope of its authority and in good faith, courts will not substitute their judgment for the board's"]; see also authorities cited there and *id.* at p. 545 [554 N.Y.S.2d at p. 816, 553 N.E.2d at p. 1326] (conc. opn. of Titone, J.) [standard analogous to business judgment rule is appropriate where "the challenged action was, in essence, a business judgment, i.e., a choice between competing and equally valid economic options" (italics omitted)].)

interest in the appropriate management of the development for the sake of maintaining its security against criminal conduct and other foreseeable risks of physical injury. In this aspect, the relationship between owner and association is somewhat analogous to that between tenant and landlord. (See generally, *Frances T., supra,* 42 Cal.3d at p. 507 [business judgment rule "applies to parties (particularly shareholders and creditors) to whom the directors owe a fiduciary obligation," but "does not abrogate the common law duty which every person owes to others—that is, a duty to refrain from conduct that imposes an unreasonable risk of injury on third parties"].)

Relying on *Frances T.,* the Court of Appeal held that a landlord-like common law duty required the Association, in discharging its responsibility to maintain and repair the common areas occasioned by the presence of termites, to exercise reasonable care in order to protect plaintiff's unit from undue damage. ■ As noted, "It is now well established that California law requires landowners to maintain land in their possession and control in a reasonably safe condition. [Citations.] In the case of a landlord, this general duty of maintenance, which is owed to tenants and patrons, has been held to include the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures." (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207], citing, inter alia, *Frances T., supra,* 42 Cal.3d at pp. 499-501.) ■ Contrary to the Court of Appeal, however, we do not believe this case implicates such duties. *Frances T.* involved a common interest development resident who suffered " 'physical injury, not pecuniary harm . . . .' " (*Frances T., supra,* 42 Cal.3d at p. 505, quoting *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 1 Cal.3d at p. 595; see also *id.* at p. 507, fn. 14.) Plaintiff here, by contrast, has not resided in the Development since the time that significant termite infestation was discovered, and she alleges neither a failure by the Association to maintain the common areas in a reasonably safe condition, nor knowledge on the Board's part of any unreasonable risk of physical injury stemming from its failure to do so. Plaintiff alleges simply that the Association failed to effect necessary pest control and repairs, thereby causing her pecuniary damages, including diminution in the value of her unit. Accordingly, *Frances T.* is inapplicable.

Plaintiff warns that judicial deference to the Board's decision in this case would not be appropriate, lest every community association be free to do as little or as much as it pleases in satisfying its obligations to its members. We do not agree. Our respecting the Association's discretion, under this Declaration, to choose among modes of termite treatment does not foreclose the

possibility that more restrictive provisions relating to the same or other topics might be "otherwise provided in the declaration[s]" (Civ. Code, § 1364, subd. (b)(1)) of other common interest developments. As discussed, we have before us today a declaration constituting a general scheme for maintenance, protection and enhancement of value of the Development, one that entrusts to the Association the management, maintenance and preservation of the Development's common areas and confers on the Board the power and authority to maintain and repair those areas.

Thus, the Association's obligation at issue in this case is broadly cast, plainly conferring on the Association the discretion to select, as it did, among available means for addressing the Development's termite infestation. Under the circumstances, our respecting that discretion obviously does not foreclose community association governance provisions that, within the bounds of the law, might more narrowly circumscribe association or board discretion.

Citing Restatement Third of Property, Servitudes, Tentative Draft No. 7,[9] plaintiff suggests that deference to community association discretion will undermine individual owners' previously discussed right, under Civil Code section 1354 and *Nahrstedt, supra*, 8 Cal.4th at page 382, to enforce recorded CC&R's as equitable servitudes, but we think not. ▮ "Under well-accepted principles of condominium law, a homeowner can sue the association for damages and an injunction to compel the association to enforce the provisions of the declaration. [Citation.] More importantly here, the homeowner can sue directly to enforce the declaration." (*Posey* v. *Leavitt* (1991) 229 Cal.App.3d 1236, 1246-1247 [280 Cal.Rptr. 568], citing *Cohen*

---

[9]The Restatement tentative draft proposes that "In addition to duties imposed by statute and the governing documents, the association has the following duties to the members of the common interest community: [¶] (a) to use ordinary care and prudence in managing the property and financial affairs of the community that are subject to its control." (Rest.3d Property, Servitudes (Tent. Draft No. 7, Apr. 15, 1998) ch. 6, § 6.13, p. 325.) "The business judgment rule is not adopted, because the fit between community associations and other types of corporations is not very close, and it provides too little protection against careless or risky management of community property and financial affairs." (*Id.*, com. b at p. 330.) It is not clear to what extent the Restatement tentative draft supports plaintiff's position. As the Association points out, a "member challenging an action of the association under this section has the burden of proving a breach of duty by the association" and, when the action is one within association discretion, "the additional burden of proving that the breach has caused, or threatens to cause, injury to the member individually or to the interests of the common interest community." (Rest.3d Property (Tent. Draft No. 7), *supra*, § 6.13, p. 325.) Depending upon how it is interpreted, such a standard might be inconsistent with the standard we announced in *Nahrstedt*, viz., that a use restriction is enforceable "*not* by reference to facts that are specific to the objecting homeowner, but by reference to the common interest development as a whole." (*Nahrstedt, supra*, 8 Cal.4th at p. 386, italics in original.)

v. *Kite Hill Community Assn., supra,* 142 Cal.App.3d 642.) Nothing we say here departs from those principles.

■ Finally, plaintiff contends a rule of judicial deference will insulate community association boards' decisions from judicial review. We disagree. As illustrated by *Fountain Valley Chateau Blanc Homeowner's Assn.* v. *Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 754-755 [79 Cal.Rptr.2d 248] (*Fountain Valley*), judicial oversight affords significant protection against overreaching by such boards.

In *Fountain Valley*, a homeowners association, threatening litigation against an elderly homeowner with Hodgkin's disease, gained access to the interior of his residence and demanded he remove a number of personal items, including books and papers not constituting "standard reading material," claiming the items posed a fire hazard. (*Fountain Valley, supra,* 67 Cal.App.4th at p. 748.) The homeowner settled the original complaint (*id.* at p. 746), but cross-complained for violation of privacy, trespass, negligence and breach of contract (*id.* at p. 748). The jury returned a verdict in his favor, finding specifically that the association had acted unreasonably. (*Id.* at p. 749.)

Putting aside the question whether the jury, rather than the court, should have determined the ultimate question of the reasonableness *vel non* of the association's actions, the Court of Appeal held that, in light of the operative facts found by the jury, it was "virtually impossible" to say the association had acted reasonably. (*Fountain Valley, supra,* 67 Cal.App.4th at p. 754.) The city fire department had found no fire hazard, and the association "did not have a good faith, albeit mistaken, belief in that danger." (*Ibid.*) In the absence of such good faith belief, the court determined the jury's verdict must stand (*id.* at p. 756), thus impliedly finding no basis for judicial deference to the association's decision.

Plaintiff suggests that our previous pronouncements establish that when, as here, a community association is charged generally with maintaining the common areas, any member of the association may obtain judicial review of the reasonableness of its choice of means for doing so. To the contrary, in *Nahrstedt* we emphasized that "anyone who buys a unit in a common interest development with knowledge of its owners association's discretionary power accepts 'the risk that the power may be used in a way that benefits the commonality but harms the individual.'" (*Nahrstedt, supra,* 8 Cal.4th at p. 374, quoting Natelson, *Consent, Coercion, and "Reasonableness" in Private*

*Law: The Special Case of the Property Owners Association, supra*, 51 Ohio State L.J. at p. 67.)[10]

Nor did we in *Nahrstedt* impose on community associations strict liability for the consequences of their ordinary discretionary economic decisions. As the Association points out, unlike the categorical ban on pets at issue in *Nahrstedt*—which arguably is either valid or not—the Declaration here, in assigning the Association a duty to maintain and repair the common areas, does not specify *how* the Association is to act, just that it should. Neither the Declaration nor Civil Code section 1364 reasonably can be construed to mandate any particular mode of termite treatment.

Still less do the governing provisions require that the Association render the Development constantly or absolutely termite-free. Plainly, we must reject any per se rule "requiring a condominium association and its individual members to indemnify any individual homeowner for any reduction in value to an individual unit caused by damage. . . . Under this theory the association and individual members would not only have the duty to repair as required by the CC&Rs, but the responsibility to reimburse an individual homeowner for the diminution in value of such unit regardless if the repairs had been made or the success of such repairs." (*Kaye* v. *Mount La Jolla Homeowners Assn.* (1988) 204 Cal.App.3d 1476, 1487 [252 Cal.Rptr. 67] [disapproving cause of action for lateral and subjacent support based on association's failure, despite efforts, to remedy subsidence problem].)

The formulation we have articulated affords homeowners, community associations, courts and advocates a clear standard for judicial review of discretionary economic decisions by community association boards, mandating a degree of deference to the latter's business judgments sufficient to discourage meritless litigation, yet at the same time without either eviscerating the long-established duty to guard against unreasonable risks to residents' personal safety owed by associations that "function as a landlord in maintaining the common areas" (*Frances T., supra*, 42 Cal.3d at p. 499) or modifying the enforceability of a common interest development's CC&R's (Civ. Code, § 1354, subd. (a); *Nahrstedt, supra*, 8 Cal.4th at p. 374).

Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make

---

[10]In this connection we note that, insofar as the record discloses, plaintiff is the only condominium owner who has challenged the Association's decision not to fumigate her building. To permit one owner to impose her will on all others and in contravention of the governing board's good faith decision would turn the principle of benefit to " 'the commonality but harm [to] the individual' " (*Nahrstedt, supra*, 8 Cal.4th at p. 374) on its head.

the detailed and peculiar economic decisions necessary in the maintenance of those developments. A deferential standard will, by minimizing the likelihood of unproductive litigation over their governing associations' discretionary economic decisions, foster stability, certainty and predictability in the governance and management of common interest developments. Beneficial corollaries include enhancement of the incentives for essential voluntary owner participation in common interest development governance and conservation of scarce judicial resources.

## DISPOSITION

For the foregoing reasons, the judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.