YEGAN, J., Dissenting:
I know unfairness when I see it. The judgment should be reversed because plaintiffs are entitled to a ruling from the trial court that the Ketelhuts were conducting a business in violation of the Covenants, Conditions, and Restrictions running with the land. (CC&Rs.) It does not matter whether the Ketelhuts could win an award for having the most beautiful vineyard in the world. It does not matter whether the wine from the grapes rivals the finest wines of the Napa Viticulture. As I shall explain, the facts unerringly point to the conclusion that the Ketelhuts were conducting a vineyard business on their property (the Property).
There will, of course, be situations in which the conducting of a business at a residence in violation of the CC&Rs will be so trivial to the neighborhood that it will be deemed not to be in violation of the CC&Rs. There is no reason to list them and one is only limited by imagination. As Colonel Stonehill said, "I do not entertain hypotheticals. The world, as it is, is vexing enough." (True Grit (2010 film).) So here, we need only decide whether the maintenance of the vineyard as a business is in violation of the CC&Rs.
*21 Judicial Deference Rule
The judicial deference rule applies where an association board "exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas." ( *582 Lamden v. La Jolla Shores Clubdominium Homeowners Assn. (1999) 21 Cal.4th 249, 265, 87 Cal.Rptr.2d 237, 980 P.2d 940 ( Lamden ).) In Lamden our Supreme Court concluded that the courts should defer to the board's treatment of a termite problem because it was "a matter entrusted to [the board's] discretion under the [CC&Rs] and [now repealed] Civil Code section 1364." ( Id . at pp. 264-265, 87 Cal.Rptr.2d 237, 980 P.2d 940.) Here, there is no statute or provision in the CC&Rs entrusting to the discretion of the Los Robles Hills Estates Board of Directors (Board) whether a homeowner is engaging in prohibited business or commercial activity within the meaning of the CC&Rs. This is a straightforward legal question to be decided by the courts, not members of the Board who lack legal expertise. (See Smart v. Carpenter (Ct.App. 2006) 139 N.M. 524, 134 P.3d 811, 814 [it "is a question of law" whether homeowner violated covenant prohibiting " 'commercial activity or business' on any tract in the Subdivision"].)
The inapplicability of the judicial deference rule is supported by Dover Village Assn. v. Jennison (2010) 191 Cal.App.4th 123, 119 Cal.Rptr.3d 175 ( Dover Village ). There, the issue was whether a sewer pipe was ordinary "common area to be maintained and repaired by the Association" or " '[an] exclusive use common area' " designed to serve a particular homeowner who would be responsible for its maintenance. ( Id . at pp. 126-127, 119 Cal.Rptr.3d 175.) The Association decided that the sewer pipe was the defendant homeowner's responsibility because it exclusively serviced his condominium. The appellate court concluded that the sewer pipe was not an exclusive use common area. It rejected the Association's argument that, under Lamden , it should defer to the Association's decision: "The argument fails because it confuses a legal issue governed by statutory and contract text with matters that genuinely do lend themselves to board discretion. [¶] [¶] There is an obvious difference between a legal issue over who precisely has the responsibility for a sewer line [or whether a homeowner is engaged in prohibited business or commercial activity within the meaning of the CC&Rs] and how a board should go about making a repair that is clearly within its responsibility. ... [W]e know of no provision in the Davis-St[e]rling Act or the CC&R's that makes the Association or its board the ultimate judge of legal issues affecting the development." ( Id . at p. 130, 119 Cal.Rptr.3d 175 )
The court considered Lamden to be "a nice illustration of matters genuinely within a board's discretion." ( *22 Dover Village , supra , 191 Cal.App.4th at p. 130, 119 Cal.Rptr.3d 175.) Unlike Lamden , the legal issue here is not genuinely within the Board's discretion. In Lamden the Supreme Court noted, "Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments." ( Lamden , supra , 21 Cal.4th at pp. 270-271, 87 Cal.Rptr.2d 237, 980 P.2d 940.) In contrast to Lamden , the Board is not equipped to determine whether the Ketelhuts were engaged in business or commercial activity in violation of the CC&Rs.
If the judicial deference rule applied here, there would be few board decisions to which it did not apply. The judicial deference rule "does not create a blanket immunity for all the decisions and actions of a homeowners association." ( Affan v. Portofino Cove Homeowners Assn. (2010) 189 Cal.App.4th 930, 940, 117 Cal.Rptr.3d 481.)
*583 The Vineyard Is Business or Commercial Activity within the Meaning of the CC&Rs
The majority opinion concludes that, as a matter of law, the Ketelhuts' operation of the vineyard is not a prohibited business or commercial activity because it does not affect the residential character of the community. But paragraph 1.01 of the CC&Rs does not say, "No lot shall be used for any purpose (including any business or commercial activity [that does not affect the residential character of the community ] ) other than for the residence of one family and its domestic servants." (Italicized language added.) " ' "In construing a contract which purports on its face to be a complete expression of the entire agreement, courts will not add thereto another term, about which the agreement is silent. [Citation.]" ' [Citation.]" (The Ratcliff Architects v. Vanir Construction Management , Inc. (2001) 88 Cal.App.4th 595, 602, 106 Cal.Rptr.2d 1.) On its face paragraph 1.01 prohibits any business or commercial activity without qualification or exception. Subparagraph 3 of paragraph 2.03 of the CC&Rs provides that "[f]or good cause shown ... deviations from the applicable deed restrictions" may be allowed "to avoid unnecessary hardships or expense, but no deviation shall be allowed to authorize a business or commercial use ." (Italics added.) How can the operation of a commercial vineyard not qualify as commercial use?
There may be cases where business or commercial activity is so de minimis or concealed that it does not violate the CC&Rs, such as the example given in the majority opinion of an appellate attorney with a home office who sees no clients on the premises. But the Ketelhuts' operation of their commercial vineyard was neither de minimis nor concealed. They filed a fictitious business name statement and were issued both a business license *23 and an alcoholic beverage sales license. The licenses originally indicated that the business was located at the Property. Board member Yen testified: "[A] notice of intent to sell [alcoholic beverages] ... was posted on their front where their mailbox was, and it needed to be posted elsewhere because you're not supposed to be advertising a business in the community. So they were advised not to post it there." The Ketelhuts advertised on Facebook, Twitter, their personal web site, "and through [their] wholesale accounts." They filed an Internal Revenue Service Schedule C (Form 1040) to report their business income or loss. The logo "Los Robles Hills Winery" and their website address were displayed on the exterior of their truck. Although the Ketelhuts covered the truck while it was parked on the Property, the logo and website address were openly displayed when they drove the truck to and from the Property.
The Ketelhuts sought and obtained publicity for their winery by giving an interview to the local newspaper, the Ventura County Star. In January 2011 the newspaper published an article about the winery. Until he read the article, plaintiff John Mitchell was not aware that the Ketelhuts were growing grapes for a commercial purpose. Mitchell "knew that they weren't supposed to be doing an activity like that because of the CC&Rs," which "exclude any business activity."
A copy of the newspaper article was marked as Exhibit 54, but it was neither offered nor received into evidence. I quote from the article because it was before the trial court, witnesses testified as to its content, Felipa Eith quoted from the article during her examination of Jeffrey Ketelhut, and the article arguably is judicially noticeable not to prove the truth of the facts reported, but to prove the extent to *584 which the commercial nature of the vineyard was publicized. ( Evid. Code, §§ 452, subd. (h), 459.)
The article takes up the entire front page of the newspaper's Sunday "Business" section ("Section E"). It is entitled, "GRAPE expectations[:] T.O. [Thousand Oaks] couple's home vineyard about to pay off." The article includes photographs of the vineyard, the Ketelhuts, and bottles of wine produced from grapes grown at the vineyard. The bottles are labeled, "Los Robles Hills." One of the photographs of the Ketelhuts is captioned, "Jeff and Marcella Ketelhut, owners of the commercial vineyard in the Conejo Valley, enjoy discussing the challenges of wine production." (Italics added.) The article includes the website address of the Ketelhuts' winery.
The article states in part: "For Jeff and Marcella Ketelhut, the dream of owning a winery has come to fruition on the slopes near their Thousand Oaks home." "The Ketelhuts are not yet making a profit but said they are selling their wine, at $35 a bottle, through their website, by word of mouth and by *24 hosting wine tastings by appointment at their home tasting room. [¶] ... The couple also has planted a selection of olive trees on the property and hopes to begin producing cured olives and olive oil for sale in the near future. [¶] They said they are exploring ways to expand their commercial enterprise, given the potential they believe exists in the Conejo Valley. [¶] 'We wanted to try it for a few years, and initially it was more of a fun thing, but now we're barely doing any marketing and the stuff is flying off the shelves,' said Marcella." The article observes that "the Ketelhuts' Los Robles Hills Winery [is] on the list of 15 [wineries] that make up the Ventura County Wine Trail." Jeffrey Ketelhut testified that in 2010 the Ketelhuts had become "members of the Ventura County Wine Trail."
Through the newspaper article, the Ketelhuts proclaimed to Ventura County residents that they were operating a commercial vineyard on the Property. It is understandable that homeowners, such as John Mitchell, would be alarmed by this development, which appeared to be a blatant violation of the CC&Rs' prohibition against "any business or commercial activity." Homeowners could view the article as a public flaunting by the Ketelhuts of their violation.
The majority opinion states, "No homeowner familiar with the vineyard's operation would have had reason to suspect that the vineyard was being used to produce wine for sale to the public." (Maj. opn., ante at p. 580.) But the newspaper article put the entire community on notice that the Ketelhuts were operating a commercial vineyard.
Moreover, the vineyard was in plain view of the homeowners. Richard Monson testified that, "[w]hen [he] drove past the Ketelhuts' home," he "noticed the grapevines on the hillside." Because the grapevines were visible to everyone, they would be a continual source of aggravation to homeowners who objected to a commercial agricultural operation in their community. The majority opinion says that the vineyard was an "aesthetic enhancement." (Maj. opn., ante at pp. 579-80.) But to the homeowners who objected to its presence, it was an eyesore.
The Ketelhuts' commercial vineyard was not permissible because, as Board member Daily testified, "Their growing grapes was part of their landscape plan." The landscape plan, which was approved in 2005 by the Board's Architectural Committee (the Committee), did not indicate that the vineyard would be used to grow grapes to make wine that would be offered for sale to the public. In 2005 the Ketelhuts did not inform the Committee of this future commercial *585 use. Had it been so informed, the Committee probably would not have approved the landscape plan.
Difficulties may arise in applying the majority opinion's standard of whether business or commercial activity affects the residential character of *25 the community. With such a vague standard, where does one draw the line between activity that affects and activity that does not affect residential character? This is a purely subjective determination.
A New Meaning for CC&Rs
Traditionally, CC&Rs are restrictions and limitations on land use. Now at the whim of the Board, CC&Rs mean "choices, creativity, and recommendations." A homeowner has a choice and may be creative in the use of property. The traditional CC&Rs have been transformed into recommendations that the Board may elect not to enforce. Rather than having the force of law, the CC&Rs have the backbone of a chocolate éclair. And, of course, the Board's composition may change and there will be inconsistency in just how much business or commercial activity will be allowed.
CC&Rs play a vital role in protecting the reasonable expectations of parties when they purchase land. This concept is lost in the majority opinion. Future buyers in the development should be expressly advised that business or commercial activity is allowed at the discretion of the Board. This may actually devalue the land.
Finally, to monetarily punish plaintiffs with attorneys' fees is not only unfair, it is unconscionable. The Ketelhuts were the "first movers." They created the entire problem by operating a commercial vineyard and publicizing it in the local newspaper. They are at fault and they should pay for it.