[No. B172607. Second Dist., Div. One. Feb. 3, 2005.]

JAMES F. O'TOOLE COMPANY, INC., Plaintiff and Respondent, v. LOS ANGELES KINGSBURY COURT OWNERS ASSOCIATION, Defendant and Appellant.

550

COUNSEL

Rapkin, Gitlin & Beaumont and Michael S. Rapkin for Defendant and Appellant.

John F. Kunath, Jr., for Plaintiff and Respondent.

OPINION

**VOGEL, J.**—A plaintiff obtained a judgment against a homeowners association. When the association failed to pay the judgment and refused to levy a special emergency assessment against its members, the plaintiff obtained an order appointing a receiver and compelling the association to levy the emergency assessment. The association appeals, claiming it cannot be ordered to impose an assessment and, inferentially, that the judgment never has to be paid. We reject the association's arguments and affirm the order.[1]

## FACTS

### A.

After the common areas of the Los Angeles Kingsbury Court, a 46-unit condominium complex in Granada Hills, were damaged in the 1994 Northridge earthquake, the Los Angeles Kingsbury Court Owners Association hired an insurance adjuster, James F. O'Toole Company, Inc., to deal with the Association's insurer. The Association agreed to pay O'Toole 10 percent of the proceeds paid by its insurer but later refused to pay, notwithstanding that the Association received about $1.4 million in insurance proceeds. O'Toole sued the Association for breach of contract and won, and (in March 2002) a judgment was entered directing the Association to pay damages to O'Toole

---

[1] To be precise, this appeal arises from a cross-complaint—and our references to plaintiff are, in reality, references to a cross-complainant.

($140,196.59) plus prejudgment interest ($59,881.19), with postjudgment interest accruing at the rate of about $80 per day. The Association did not pay the judgment.

## B.

In early 2003, O'Toole obtained a writ of execution, recorded an abstract of judgment and, by motion, sought an order directing the Association to assign to it both the regular and special assessments collected by the Association from its members (the homeowners). The Association, in turn, filed a claim of exemption, asserting that all assessment income was needed for essential services and, therefore, exempt from execution. (Civ. Code, § 1366, subd. (c).)[2]

In May, the trial court agreed with the Association that its claimed expenses were essential, and that all *regular assessments* collected by the Association were exempt from execution. At the same time, the court held that O'Toole's judgment was an "extraordinary expense" within the meaning of subdivision (b) of section 1366, that the Association had "the power to levy an *emergency assessment* to satisfy [the] judgment," that the Association's general duty to maintain its property included a more specific duty to meet its legal obligations, that it was obligated to pay a valid civil money judgment entered against it, and that it was thus required to levy a *"special"* or *"emergency" assessment* to raise the money needed to pay the judgment. To that end, the court ordered the Association "to convene a meeting of the individual condominium owners . . . to consider and provide for a meaningful emergency assessment so as to satisfy [O'Toole's] judgment."

## C.

The Association held a meeting in May, but the members refused to impose an emergency assessment to pay O'Toole's judgment. O'Toole then filed a motion for an order directing the Association to levy a special emergency assessment or, in the alternative, for an order appointing a receiver to levy and administer a special emergency assessment. Over the Association's opposition, the trial court granted O'Toole's motion for the appointment of a

---

[2] Undesignated section references are to the Civil Code, primarily to the Davis-Stirling Common Interest Development Act, section 1350 et seq., which applies "whenever a separate interest coupled with an interest in the common area or membership in the association is, or has been, conveyed" under specified circumstances that include most homeowners' associations. (§ 1352.) Assessments and exemptions are discussed at length below.

receiver to levy and administer a special emergency assessment, then stayed its order to permit the Association to pursue this appeal.[3]

## DISCUSSION

■ Unless otherwise provided in a homeowners association's declaration of common interest development, the association is responsible for the repair and maintenance of the common areas. (§ 1364, subd. (a).) In this case, in typical form, the Los Angeles Kingsbury Court Owners Association's Declaration charges the Association with the duty to "maintain, repair, restore, replace and make necessary improvements to the Common Area so that the same are at all times in a first-class condition and good state of repair," and to "pay, out of the general funds of the Association, the costs of any such maintenance and repair . . . ." After the Northridge earthquake, the Association took the first step but not the second, and the question now before us is whether the Association can be compelled to impose an assessment to obtain the money needed to pay for the work that was performed for the benefit of the Association and its members. For the reasons that follow, we answer the question affirmatively.

## A.

■ The relationship between individual homeowners and the managing association of a common interest development is complex (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 266 [87 Cal.Rptr.2d 237, 980 P.2d 940]), and their respective rights depend upon the nature of the particular dispute. Some years ago, in *Duffey v. Superior Court* (1992) 3 Cal.App.4th 425, 428–429 [4 Cal.Rptr.2d 334], the court observed that associations were sometimes treated as landlords (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 499–501 [229 Cal.Rptr. 456, 723 P.2d 573] [association could be held liable for rape and robbery of individual owner who was not allowed to install additional lighting at time of crime wave]), sometimes as "minigovernments" (*Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 844 [182 Cal.Rptr. 813] [gated community could not discriminate among give-away newspapers]), sometimes as businesses (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 796 [191 Cal.Rptr. 320, 662 P.2d 427] [condominium project with age restrictions was "business" within the meaning of Unruh Civil Rights Act]), and sometimes as corporations (*Beehan v. Lido Isle*

---

[3] We summarily reject O'Toole's contention that the appeal, filed on January 7, 2004, to challenge an order made on November 14, 2003, is untimely. (Cal. Rules of Court, rule 2.) The fact that the Association purported to appeal from an earlier interim order, then withdrew its appeal, does not affect the fact that (as O'Toole concedes) the November 14, 2003, order is a final, appealable order.

*Community Assn.* (1977) 70 Cal.App.3d 858, 865–867 [137 Cal.Rptr. 528] [board of directors' good faith refusal to take action against construction of house in arguable contravention of setback restrictions was protected by corporate business judgment rule]).

■ More recently, the Supreme Court has differentiated between (1) the situation where, for the sake of maximizing the value of the homeowner's investment, each individual owner has an economic interest in the proper management of the development as a whole, and the relationship between the owner and the association is analogous to that of a shareholder to a corporation, and (2) the situation where an individual owner who resides in the development has a personal, "not strictly economic," interest in the appropriate management of the development in a manner that will keep the property secure from risks of physical injury, in which sense the relationship is analogous to that between a tenant and landlord. (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn., supra,* 21 Cal.4th at pp. 266–267.)

This case—where the homeowners' interests are strictly economic—is plainly one in which the relationship of the Association to the homeowners is akin to that of a corporation to its shareholders.

## B.

We begin by rejecting the Association's contention that it is not required to levy a special emergency assessment to satisfy a civil judgment, and that the trial court had no power to order it to do so. As relevant, section 1366 provides:

"(a) *Except as provided in this section, the association shall levy regular and special assessments sufficient to perform its obligations under the governing documents and this title.* However, annual increases in *regular assessments* for any fiscal year . . . shall not be imposed unless the board has complied with [specified requirements].

"(b) Notwithstanding more restrictive limitations placed on the board by the governing documents, the board of directors may not impose a *regular assessment* that is more than 20 percent greater than the regular assessment for the association's preceding fiscal year *or impose special assessments which in the aggregate exceed 5 percent of the budgeted gross expenses of the association for that fiscal year without the approval of owners,* constituting a quorum, casting a majority of the votes at a meeting or election of the association . . . . *This section does not limit assessment increases necessary for emergency situations.* For purposes of this section, an emergency situation is any one of the following:

"(1) *An extraordinary expense required by an order of a court.*

"(2) An extraordinary expense necessary to repair or maintain the common interest development or any part of it for which the association is responsible where a threat to personal safety on the property is discovered.

"(3) An extraordinary expense necessary to repair or maintain the common interest development or any part of it for which the association is responsible that could not have been reasonably foreseen by the board in preparing and distributing the pro forma operating budget under Section 1365. . . .

"(c) *Regular assessments* imposed or collected to perform the obligations of an association under the governing documents or this title *shall be exempt from execution by a judgment creditor of the association only to the extent necessary for the association to perform essential services*, such as paying for utilities and insurance. In determining the appropriateness of an exemption, a court shall ensure that only essential services are protected under this subdivision. . . ." (Italics added.)

In furtherance of its duties under the Association's Declaration, the Association retained O'Toole as the first step in arranging for the repairs necessitated by the Northridge earthquake. O'Toole performed his part of the bargain, and his judgment establishes that he is entitled to be paid for the work he performed for the Association. Although it is true, as the Association contends, that section 1366 does not *expressly obligate* it to impose a special emergency assessment to satisfy O'Toole's civil judgment, the statute most assuredly permits such an assessment in an "emergency situation," including a "situation" where an order of a court is entered in aid of enforcement of a judgment arising out of an extraordinary and unforeseeable expense necessarily incurred to repair the common areas following the Northridge earthquake. (§ 1366, subd. (b)(1)–(3).) Under the circumstances of this case, section 1366 permits the Association to impose a special emergency assessment to satisfy O'Toole's judgment.

To avoid this result, the Association claims the exemption created by subdivision (c) of section 1366 applies to special emergency assessments and thus prohibits the order made by the trial court. This argument fails for the simple reason that the subdivision (c) exemption applies only to *regular* assessments, not *special or emergency* assessments. (§ 1366, subd. (c) ["Regular assessments . . . collected to perform the obligations of an association . . . shall be exempt . . . ."].)

## C.

The Association contends the Legislature's rejection of a proposed amendment to section 1366 shows a legislative intent to prohibit the imposition of an assessment to satisfy a civil judgment. To the contrary, we believe the legislative history shows the opposite intent.

### 1.

Before its amendment in 2000, section 1366 authorized an association to levy regular and special assessments sufficient to perform its obligations, limited increases in *regular* assessments, and authorized *special* assessments for an "emergency situation" defined as an "*extraordinary expense required by an order of a court,*" an extraordinary expense necessary to repair or maintain the common area where there was a threat to personal safety, and an unforeseeable extraordinary expense necessary to repair or maintain the property. (Former § 1366, subds. (a), (b) as amended by Stats. 1992, ch. 1250, § 2, p. 5974.)

As introduced on February 7, 2000, Assembly Bill 1859 modified the first definition of "emergency situation" (for which a *special assessment* without a dollar limit could be levied) to cover "[a]n extraordinary *repair or maintenance expense* that arises from an order of a court," and added a new subdivision (c): "*Regular or special assessments* imposed or collected to perform the obligations of an association under the governing documents and this title shall be exempt from execution by a judgment creditor of the association to the extent necessary for the association to perform those obligations. . . ." (Assem. Bill No. 1859 (1999–2000 Reg. Sess.) § 1, as introduced Feb. 7, 2000, italics added.)

The bill, as introduced, did one more thing. It amended section 7350 of the Corporations Code (which generally provides that a member of a corporation is not personally liable for the corporation's debts) by adding this provision: "No member of a [homeowners] association . . . shall be required to pay assessments, fees, or other sums that exceed one-half of 1 percent of the assessed value of the member's property toward satisfaction of any claim, award, or judgment against the association, and no services provided by the association to the property may be terminated or interrupted once the maximum payment specified herein has been made." (Assem. Bill No. 1859 (1999–2000 Reg. Sess.) § 2, as introduced

Feb. 7, 2000.) This provision was deleted by an April 13 amendment to the bill. (Assem. Amend. to Assem. Bill No. 1859 (1999–2000 Reg. Sess.) § 2, Apr. 13, 2000.)

### 2.

According to the Assembly Committee on Housing and Community Development (in a report prepared for an April 26 hearing), the bill was a response to an extremely unusual and complex problem arising out of the Northridge earthquake. A contractor sued a homeowners association for trade libel and interference with prospective business relations and won a $6.6 million judgment. A receiver was appointed, and he used the association's regular and special assessments to pay the contractor, leaving the association without any money to pay for its essential services. The Committee noted conflicting concerns about (1) the six million California residents who belong to homeowners associations and the effect on our housing market "if consumers become frightened to purchase condominiums and townhouses due to the potential personal risk," and (2) "the potential impact of whether contractors will shy away from conducting repairs if they are left with little remedy in the event a [homeowners association] breaches a contract." (Assem. Com. on Housing and Community Development, Analysis of Assem. Bill No. 1859 (1999–2000 Reg. Sess.) as amended Apr. 26, 2000, p. 5.)

### 3.

Recognizing these problems, the author amended the bill to provide (in the new subdivision (c) of section 1366) that, "to the extent the total, nonexempt assessments collected by the association are insufficient to satisfy the judgment of a judgment creditor, the association would be required to impose a special assessment sufficient to satisfy that judgment." (Assem. Amend. to Assem. Bill No. 1859 (1999–2000 Reg. Sess.) § 1, May 3, 2000, italics omitted.) As noted in a report to the Assembly Committee on Judiciary (May 9, 2000), at "the Committee staff's recommendation, the author agreed to limit the assessments exempted from execution by a judgment creditor . . . to only those assessments required for 'essential services.' This amendment seeks to address the concern that, by exempting *regular assessments* from judgment, a judgment creditor would be unable to collect. For example, it would be unfair to deny a plaintiff who successfully sued an association for discrimination because the association denied him or her an opportunity to purchase a condominium based on his or her race the ability to collect. *The bill, by limiting the assessments protected to only those necessary for*

*essential services, now strikes a reasonable balance between ensuring that such plaintiffs will be able to recover and ensuring that homeowner associations will not be forced to turn the lights off in order to pay a judgment."* (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1859 (1999–2000 Reg. Sess.) as amended May 3, 2000, p. 5, italics added.)

### 4.

The next amendment (May 16, 2000) expanded the first definition of an "emergency situation" justifying a *special assessment* by changing it from "[a]n extraordinary repair or maintenance expense that arises from an order of a court" back to the original language—"[a]n extraordinary expense required by an order of a court"—and, at the same time, limited the exemption in subdivision (c) to regular assessments: *"Regular assessments* imposed or collected to perform the obligations of an association under the governing documents or this title shall be exempt from execution by a judgment creditor of the association only to the extent necessary for the association to perform essential services, such as paying for utilities and insurance. . . ." (Assem. Amend. to Assem. Bill No. 1859 (1999–2000 Reg. Sess.) § 1, May 16, 2000, italics added.) As later described in one of the legislative reports, this meant the "bill would provide that *regular assessments* collected to perform the obligations of a homeowner association are exempt from execution by a judgment creditor of the association to the extent necessary for the association to perform essential services . . . ." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1859 (1999–2000 Reg. Sess.) as amended May 16, 2000, p. 3, italics added.)

As the Senate Judiciary Committee noted in regard to the May 16 amendment, the case that triggered legislative interest did so because a court had authorized a receiver to levy against both regular and special assessments, leaving the residents of that development without money to provide for essential services, and that the problem in that case was both "unusual and complex." As amended on May 16, the idea was that the "bill would re-balance the interests of the various parties and provide limited protection to homeowners against creditors to assure that essential services are exempt from the execution by a judgment creditor in the event that the association or the members have not provided themselves with adequate protection from such situations. Any attempt to further protect homeowners in associations from judgment creditors would, undoubtedly, tip the scales and possibly

provide for unintended consequences." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1859 (1999–2000 Reg. Sess.) as amended May 16, 2000, pp. 4–6.)

**5.**

By June, there had been more amendments and the author himself admitted the *only* purpose of the bill was "to exempt a limited portion of the *regular assessments* from execution by a judgment creditor in order to assure that 'essential services' are provided to the homeowners from the regular assessment income even while a judgment is being paid off." (Sen. Rules Com., Analysis of Assem. Bill No. 1859 (1999–2000 Reg. Sess.) as amended in Sen. June 15, 2000, p. 5, italics added.) It was in this form that the bill was adopted, and that section 1366, subdivision (c) came to provide that: *"Regular assessments* imposed or collected to perform the obligations of an association under the governing documents or this title shall be exempt from execution by a judgment creditor of the association only to the extent necessary for the association to perform essential services, such as paying for utilities and insurance. In determining the appropriateness of an exemption, a court shall ensure that only essential services are protected under this subdivision. [¶] This exemption shall not apply to any consensual pledges, liens, or encumbrances that have been approved by the owners of an association, constituting a quorum, casting a majority of the votes at a meeting or election of the association, or to any state tax lien, or to any lien for labor or materials supplied to the common area." (Stats. 2000, ch. 125, § 1, italics added.)

Quite plainly, the Legislature did exactly what it set out to do—it protected regular assessments to the extent necessary to ensure that homeowners were not deprived of essential services, and at the same time protected the rights of judgment creditors (such as O'Toole) by allowing them to execute against an association's *special emergency* assessments and, where available, an association's *excess* (nonexempt) regular assessments. That is precisely what happened in this case, where the trial court *granted* the Association's request for an exemption covering *all* of its regular assessments and limited O'Toole's right of recovery to a fund to be created out of a *special emergency* assessment. As we said, the legislative history defeats rather than supports the Association's position.

## D.

We summarily reject the Association's remaining contentions.

First, the Association's refusal to impose a special emergency assessment was not a "business decision" of the sort to which the courts must defer under *Lamden v. La Jolla Shores Clubdominium Homeowners Assn., supra,* 21 Cal.4th 249. Generously construed, the Association's refusal to levy a special emergency assessment is a simple refusal to pay a final judgment long since due. While that refusal may in some sense constitute a "business decision," it is not one to which a court must defer by refusing to enforce a valid judgment.

Second, these proceedings do not in any manner violate the homeowners' rights. The imposition of a special emergency assessment will not transform the homeowners into judgment debtors or otherwise make them personally liable for the debts of the Association. This was and will remain an action against the Association, not an action against the homeowners. As we explained in *ECC Construction, Inc. v. Ganson* (2000) 82 Cal.App.4th 572 [98 Cal.Rptr.2d 292], an action by a contractor against a homeowners association *and the individual homeowners* to recover for repairs necessitated by the Northridge earthquake, the homeowners were not parties to the contract, and the contractor's contractual remedies had to be pursued against the Association, not the homeowners. (*Id.* at pp. 575–576.)

■ O'Toole is doing precisely what he is by law obligated to do. It has obtained a judgment against the Association, and is now compelling the Association to look to its members, the homeowners, to create a fund to pay the debt incurred for their common benefit. When the special assessment is levied, the homeowners will be liable to the Association, not to O'Toole, and it will be up to the Association to collect the money that is owed to it. (*ECC Construction, Inc. v. Ganson, supra,* 82 Cal.App. 4th at pp. 576–577; and see *Park Place Estates Homeowners Assn. v. Naber* (1994) 29 Cal.App.4th 427, 431–432 [35 Cal.Rptr.2d 51] [assessments become the debt of the homeowner at the time the assessment is levied; if the homeowner defaults, the association may file a lien on the homeowner's interest; if the default is not corrected the association may pursue any legal remedy, including judicial foreclosure].)

It follows that the trial court correctly ordered the Association to impose a special emergency assessment and, in light of the Association's refusal to do so, correctly decided to appoint a receiver to carry out the court's order. (Code Civ. Proc., §§ 187, 128, subd. (a)(4); *Potomac Oil Co. v. Dye* (1910) 14 Cal.App. 674, 679–680 [113 P. 126].)

## DISPOSITION

The order is affirmed. O'Toole is awarded its costs of appeal.

Mallano, Acting P. J., and Suzukawa, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.