Filed 8/28/25; Modified & Certified for Publication 9/29/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOUG RIDLEY et al., | H052560 |
| Plaintiffs and Respondents, | (Santa Clara County Super. Ct. No. 19CV349909) |
| v. | |
| RANCHO PALMA GRANDE HOMEOWNERS ASSOCIATION et al., | |
| Defendants and Appellants. | |

This appeal is from an injunction requiring supplemental repairs to a condominium. The underlying suit arises out of flooding in the crawlspace beneath the condominium owned by Doug Ridley and Sherry Shen. Because this crawlspace is a common area controlled by the homeowners' association, Rancho Palma Grade Homeowners Association (HOA), the HOA rather than the homeowners was responsible for investigating and remedying the water intrusion. The HOA took more than 19 months to remove the water and begin making meaningful repairs, and in the interim the homeowners' unit suffered severe damage. Accordingly, the homeowners sued the HOA and its now-former president, Steve Moritz.

After an unusually long bench trial lasting more than 60 court days, the trial court found in favor of the homeowners on all their claims. While many repairs were

subsequently performed, others were not, and the trial court issued an injunction requiring the HOA to perform the remaining repairs and compensate the homeowners for lost rent and other expenses.

The HOA and Moritz appeal, arguing that the trial court erred in finding in the homeowners' favor on any of their claims. We need address only one claim: that the HOA breached its duties under the condominium complex's covenants and conditions. As explained below, we conclude that the trial court properly found in the homeowners' favor on this claim. Because this claim supports the injunction being appealed, we affirm.

## I. BACKGROUND

### A. The CCRs

Rancho Palma Grande is a condominium complex in Santa Clara with over 100 units. In 1981, the complex's developers executed a Declaration of Covenants, Conditions and Restrictions (the CCRs) dividing the development into condominiums and establishing a "Home-Owners Association" to manage the complex.

The CCRs grant the HOA a number of powers and duties. One set concerns the maintenance and repair of common areas: The CCRs grant the HOA the power and the duty "[t]o manage, operate, maintain, repair, paint, landscape, care for and preserve the Common Area, and all its facilities, improvements, and landscaping . . . to the standard of maintenance prevalent in the neighborhood . . . ."

The CCRs contain an exculpation clause limiting the HOA's liability. Under the clause, the HOA generally is not liable for property damage or personal injury "caused by the elements" or "resulting from electricity, water, rain, dust, or sand which may leak or flow from outside or from any parts of the buildings." However, this limitation on liability does not apply to damage or injury "caused by gross negligence of the Association."

2

In 1991, Doug Ridley, who is now 85 years old, purchased a unit in Rancho Palma Grande located at 2006 Stone Pine Court (the homeowners' unit). Ridley later married Sherry Shen, and the two lived in the homeowners' unit for a decade before they moved out and began renting the unit for retirement income.

In 2017, Steve Moritz became president of the HOA.

## B. The Undestroyed Well

### 1. The April 2018 Flooding

In April 2018, tenants in the homeowners' unit reported flooding in the crawlspace underneath the unit. The homeowners and the HOA initially thought that the water was from a leaky pipe, which is an owner responsibility. However, a plumber hired by the homeowners did not see anything wrong with the plumbing and concluded that the water came from an underground well or spring. In addition, a plumber hired by the HOA learned from the City of Santa Clara (City) that the water was likely caused by an abandoned but undestroyed well. Because the crawl space is a common area, the HOA accepted responsibility for remedying the water that intruded into it from outside the homeowners' unit. However, the HOA permitted the homeowners to finish installing a sump pump to remove some of the water.

### 2. Initial Opinions and Recommended Actions

In May 2018, hoping to get the City or the Santa Clara Valley Water District to pay for remediating water in the crawlspace, the HOA hired a law firm. The firm contacted the Water District, which reported that it, too, believed that the water was from "an unknown, unregistered well." The Water District also gave the firm a map showing where there likely was an abandoned but undestroyed well from a farm previously on the land where Rancho Palma Grande is now located. In addition to giving the map to the HOA, the law firm advised the HOA to take "all steps . . . to avoid further damages from the water flow under the unit" because of the "exponential costs involved if not properly addressed."

3

In early June, a water restoration consultant, the Anderson Group, recommended that the HOA dry out the crawlspace to reduce the risk of mold developing in the homeowners' unit. The Anderson Group proposed to use air movers, scrubbers, and filtration devices at a total cost of a little over $7,000. The HOA rejected the proposal. The HOA also received a report finding high moisture levels and mold in the homeowners' unit and recommending remediation measures. However, the HOA did not implement the recommendations.

A series of drilling contractors confirmed to the HOA that there was likely an undestroyed well underneath or near the homeowners' unit. In early July, the Pitcher Well Drilling Company informed the HOA that there appeared to be a well either under or close to the rear foundation of the homeowners' unit. However, Pitcher's excavator was so large that it could not be used to dig for the well without causing major damage to the homeowners' unit.

Later in July, a second drilling contractor, Dan Lynch, estimated that it would cost $7,500 to open the floor of the homeowners' unit with a mini-excavator, dig into the crawlspace, and expose the suspected wellhead. The HOA rejected this proposal. In August, Lynch examined the crawlspace and discovered a hole full of water with bubbles coming up, a sign of a well, which Lynch believed was either under the crawlspace or just outside the rear foundation. Lynch advised the HOA that the hole could continue to grow and sink, and the HOA should move quickly to avoid any further deterioration. Lynch offered, at a cost of $150 per hour, to research historical documents and attempt to triangulate the location of the suspected well, to use a metal detector to look for the well, and to install a fan in the crawlspace. The HOA rejected these proposals as well.

In November, the HOA consulted a third driller, Randy Dougherty. Dougherty noted several possible sources of the water in the crawlspace—an improperly capped well, an underground spring, or a high water table—but advised that an undestroyed well was "probable" and that the well was likely near the rear foundation or close by.

4

Dougherty suggested that the HOA use a magnetometer or ground penetrating radar to search for the well. The HOA did not do so.

### 3. *The HOA's Change of Course*

Consistent with the opinions of the City, the Water District, and the drilling contractors, Moritz initially believed that water in the crawlspace was from a well, and the HOA took the position that there was likely an undestroyed well underneath the crawlspace. For example, the HOA told the Anderson Group that there was such a well, drafted a letter to the City demanding immediate action to deal with the suspected well, and formed a "well" committee. In addition, when Ridley proposed installing a "French drain" for the water in the crawlspace, the HOA rejected the proposal because it would not destroy the suspected well "which the Association is now required to do, by law."

However, in July, the first law firm hired by the HOA concluded that neither the City nor the District could be held responsible for the damage caused by the water intruding into the crawlspace under the homeowners' unit. Sometime later in the year, the HOA changed course. It stopped trying to locate and destroy a well underneath the crawlspace and decided instead to pursue the previously rejected option of installing a French drain, which would cause less damage to the homeowners' unit and thus be less expensive. Notably, however, the board's secretary emailed the board that, based upon the latest information received, it did not appear that opening up the homeowner's unit to find and cap the suspected well would entail "catastrophic expense," and the trial court observed that the HOA withheld this "critical" communication until right before trial.

In September 2018, the HOA hired a new attorney, Steve Barber. In December, Barber contacted two hydrologists. Although Barber noted that the Water District had recharged the groundwater, he did not mention the opinions of the City, the Water District and the drilling contractors that there likely was an undestroyed well underneath the crawlspace. Unaware that a well might be causing the water intrusion, one of the hydrologists sent a preliminary analysis suggesting a French drain.

5

In January 2019, Barber sent a letter to the City and the Water District. In the letter, Barber stated that "[s]omeone" had "postulated" a well underneath the homeowners' unit and that two drilling contractors (Pitcher and Dougherty) had expressed such a belief. However, Barber asserted that the water intrusion was a "one-time event" that had not recurred and that no mold had developed in the unit. He also represented that he had "contacted several experts in the areas of hydrology and engineering," and "[n]o one with whom we consulted gives credence to the hypothesis that there is an abandoned well" under the homeowners' unit. Barber asserted as well that "[t]he consensus is that there is a high groundwater table with that abundance of water" under the condominium complex. The letter concluded by asserting that the proper solution was a "French or curtain drainage system."

Four days later, Moritz forwarded Barber's letter to Ridley and informed him that the HOA had concluded that the suspected well under Ridley's unit "most likely does not exist" and that "[n]one of the experts consulted give credence to the hypothesis . . . that an abandoned well exists." Moritz also stated that a hydrologist had recommended using a French drain to prevent water encroachment and that no mold had been found in or under the unit. Moritz's annual message to HOA members similarly asserted that a "Soil Engineer's report" stated that there was no well on HOA property and that a "Certified Industrial Hygienist report" found no mold in or under the property. At trial, Mortiz admitted that many of his statements and those in Barber's letter were false.

### 4. Subsequent Events

In March 2019, two months after Barber represented to the City and Water District that the water intrusion in the crawlspace was a one-time event, the crawlspace flooded. This flooding was worse than the year before, and three to four feet of water remained in the crawlspace through June. Nevertheless, the HOA took no steps to remove the water beyond operating the sump pump that Ridley had installed. During this time period,

plumbers hired by the HOA dug exploratory trenches in the backyard of the homeowners' unit but found no water in the trenches.

In April 2019, the HOA hired an engineer specializing in drainage, Jim Toby, to design a French drain for the homeowners' unit. Toby was not told that there might be a well underneath the unit, and therefore the plans that he created did not address the problems that a well and the debris surrounding it would create. In June, Toby informed the HOA that he believed that there was a well under the crawlspace.

Nevertheless, the HOA did not reconsider its decision that there was no well underneath the homeowners' unit. To the contrary, in July 2019, after the homeowners sued and sought a preliminary injunction, Moritz represented to the trial court that the water in the crawlspace was most likely not from an abandoned well but rather than from "a high ground water table under the subject property." This theory was contradicted by the exploratory trenches dug by HOA's plumbers: Although a high water table would have saturated the entire area, not just the crawlspace under the homeowners' unit, as noted above, there was no water in the trenches.

At the end of September, an engineering contractor discovered a sinkhole in the crawlspace. The City prohibited occupation or use of the homeowners' unit and ordered the HOA to correct the violation. Rather than resume searching for the suspected well, the HOA decided to remove soil from the crawlspace and pour concrete on top of the sinkhole.

Accordingly, in January 2020, workers hired by the HOA cut a hole in the floor of the homeowner's unit and began removing soil. After about two hours, they discovered a wellhead. The workers were not told that there might be a well underneath the soil that they were removing.

## C. Damage to the Homeowners' Unit

Although tests showed mold in the homeowners' unit by June 2019, and that month a consultant recommended drying out the crawlspace, the HOA did not

7

immediately take any action to prevent or remediate mold. Later inspections found visible mold in the kitchen. In addition, testing showed several types of mold, some toxic, in patterns consistent with growth from condensation. However, even by the time of trial in 2023, this mold had not been fully remediated.

There was another problem as well. In 2010, Ridley discovered termites and had a formal inspection done, which he passed along to the HOA. However, the HOA did nothing in response to the report, though the unit was fumigated in 2016. By the time of trial, the termite damage was "very severe" and, indeed, "a late stage cancer" for the building. Consequently, the southern exterior wall in the homeowners' unit and other structures in the house were so decayed that they could not perform their intended function and needed to be replaced.

In addition, in March 2019, an HOA board member noted that the window trim on the south wall was rotting. However, the HOA did not start repairing the trim until April 2021, more than two years later.

## D. Proceedings Below

### 1. The Pleadings

The homeowners sued the HOA in June 2019. They claimed breach of the CCRs in addition to claims for violating the Davis-Stirling Common Interest Development Act (Civ. Code, § 4000 et seq.), breach of implied warranty, negligence, nuisance, and breach of fiduciary duty. The homeowners amended their complaint in July 2021 to add Moritz, the HOA president, to the negligence and breach of fiduciary duty claims, added a constructive fraud claim against both the HOA and Moritz, and abandoned the warranty claim.

### 2. Interim Relief

The parties sought several temporary restraining orders and preliminary injunctions. In July 2019, the homeowners sought to enjoin the HOA from forcibly entering their unit. Although the trial court issued a temporary restraining order, as noted

8

above, the court denied a preliminary injunction in reliance on Moritz's representation that the water in the crawlspace was likely from a high water table and that the HOA was installing a French drain to remedy the problem. The trial court also denied a later request to require the HOA to investigate "the true source of the water condition" in the crawlspace, and it enjoined the homeowners from interfering with the HOA's repair work. Later, however, the trial court preliminarily enjoined the HOA from disabling the homeowners' security cameras.

### 3. The Trial

In April 2022, the case went to trial. The trial lasted 67 court days and produced a trial transcript of approximately 7,700 pages. In September 2022, after the parties had rested, the trial court informed the parties that it would issue an interim order concerning disputed repairs and indicated how it would rule. However, it does not appear from the record that the trial court issued a written order, and the trial judge took a medical leave of absence. Upon returning, the court issued further orders concerning, among other things, remediation of the crawlspace.

In late March 2024, after closing briefs and arguments, the trial court began to announce its finding and finished doing so two weeks later. The trial court found in favor of the homeowners on all their claims. The court awarded damages for restoration costs, lost rent, utility, and emotional distress. In addition, finding the defendants' behavior despicable, the trial court awarded $250,000 in punitive damages against the HOA and $25,000 against Moritz.

In concluding that the HOA breached the CCRs, the trial court determined that the HOA's duty to repair and maintain common areas included subsidiary duties to investigate and to make repairs in a reasonably timely fashion. The court then found that the HOA failed to properly investigate the suspected well, the mold or the terminate damage and that it is also failed to timely repair the resulting damage. Indeed, the trial

9

court observed even by the trial, six years after the initial flooding, the HOA had not restored the homeowners' unit to a livable condition.

The trial court also found that the HOA had engaged in "a pattern of falsehood [and] deception." The court found that in the spring and summer of 2018 "everything pointed very strongly to a well and suggested very strongly that the well was either directly in the crawlspace or just beyond it." Nevertheless, the HOA decided "to use any means necessary" to convince the City and the Water District that the HOA did not need to locate and destroy the suspected well. Among other things, the HOA failed to disclose the suspected well to experts in an attempt to manipulate them into providing opinions the HOA desired. Barber's January 2019 letter to the City and Water District made numerous false and misleading statements. Moreover, in what the trial court termed "very conscious acts of deception," Moritz repeated Barber's false and misleading statements to Ridley, the HOA membership, and the trial court. The HOA even failed to disclose the suspected well to the workers who eventually discovered it, which the trial court found put the workers at physical risk.

For similar reasons, the trial court found that neither the CCRs' exculpatory clause nor the business judgment rule and the related rule of judicial deference to condominium associations protected defendants. The court ruled that the exculpatory clause did not protect the HOA because much of plaintiffs' damages was caused by the HOA's failure to repair rather than the water intrusion, because the clause was against public policy and unenforceable, and because the HOA was grossly negligent. In particular, the court found gross negligence because the HOA's conduct was an extreme departure from the ordinary standard of conduct and because the HOA showed a passive or indifferent attitude to the injurious consequences of its conduct. The court also rejected the HOA's business judgment rule and rule of judicial deference defenses because the HOA did not conduct a reasonable investigation into the suspected well and because the HOA did not

10

act in good faith. In finding bad faith, the court noted the HOA's disregard of the advice it received and its "extreme acts of dishonesty."

After the trial court explained its rulings, defendants requested a written statement of decision, which the court agreed to provide. Subsequently, the court held hearings on whether to award expert witness fees, which it did.

### 4. *The Injunction*

On July 25, 2024, the trial court issued an injunction order after trial. The order required the HOA, "by and through is board of directors, including Steve Moritz," to perform specified work on the crawl space, the south wall, and the interior and kitchen of the homeowners' unit. In addition, the order stated that "[t]he HOA will remain liable to the Plaintiffs for lost rent of $4,000 per month and utilities of $115 month" until completion of the required work.

### 5. *Subsequent Proceedings*

On September 19, 2024, Moritz and the HOA appealed from the injunction issued on July 25, 2024. The homeowners moved for a calendar preference, which was granted.

While the appeal was pending, the parties filed amended proposed statements of decisions, and the trial court issued a statement of decision on February 26, 2025.

## II. DISCUSSION

Although the HOA appeals from the injunction issued after trial, it does not challenge the appropriateness of injunctive relief or the terms of the injunction. Instead, the HOA challenges the claims underlying the injunction. We need address only one of these claims: that the HOA breached its duties under the condominium CCRs. Moreover, while the parties dispute whether the 2019 amended CCRs apply, we need only address the original CCRs adopted in 1981.[*]

---

[*] The homeowners did not include Moritz in their CCRs claim. However, we need not consider the claims against Moritz to review the injunction on appeal because the injunction does not impose any obligations upon Moritz personally. Instead, the

11

As a general rule, a condominium association's covenants and restrictions are enforceable equitable servitudes, which benefit all condominium owners (Civ. Code, § 5975, subd. (a)), and individual owners may enforce the covenants and restrictions against the association (*id*., § 5975, subd. (b)). In addition, because the promises in such covenants and restrictions are of a "contractual nature," their enforcement is " 'subject to contract principles.' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 239.)

The HOA challenges the trial court's findings that the HOA breached its duties under the CCRs to investigate and to timely repair as well as the court's rejection of several affirmative defenses. We address these issues below.

## A. Breach of the CCRs

Section 8 of the CCRs imposes on the HOA the duty "[t]o manage, operate, maintain, repair, paint, landscape, care for and preserve the Common Area . . . to the standard of maintenance prevalent in the neighborhood." It is undisputed that the crawlspace underneath the homeowners' unit is a common area and that the HOA's duty to maintain and repair that area includes subsidiary duties to investigate water intrusions and to make repairs in a reasonably timely fashion. The HOA argues that the homeowners failed to present sufficient evidence that the HOA breached these subsidiary duties. As explained below, we conclude that the trial court's findings of breach are supported by substantial evidence.

---

injunction was issued against the HOA, "by and through its board of directors, including Steve Moritz," and it stated that "[t]he HOA"—not the HOA's board or Moritz—"will remain liable" for lost rent. Moreover, Moritz has left the board. Because the HOA plainly has standing to bring this appeal, and Moritz does not seek any relief beyond that sought by the HOA, we need not determine whether Moritz is aggrieved and has standing. (See, e.g., *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1035; *In re Sarah S.* (1996) 43 Cal.App.4th 274, 282, fn. 10.)

### 1. *The Substantial Evidence Standard*

In arguing that the evidence of breach was insufficient, the HOA faces a " ' "daunting burden." ' " (*Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 438.)  Factual findings are governed by the substantial evidence standard, and under that standard, appellate courts do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.)  Instead, "the appellate court's power begins and ends with a determination of whether there is any substantial evidence" (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582)—that is, whether there is " ' " 'evidence that is reasonable, credible, and of solid value.' " ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117.)  In determining whether there is substantial evidence, appellate courts review the record " ' " 'in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.' " ' " (*Carranza v. City of Los Angeles* (2025) 111 Cal.App.5th 388, 400.)

### 2. *The Investigation*

There is substantial evidence that the HOA failed to conduct a reasonable investigation.

The HOA had notice that the water in the crawlspace under the homeowners' unit may have been from an undestroyed well.  In May 2018, the HOA received reports that both the City and the Water District believed the water in the crawlspace was from an undestroyed well, and the Water District provided the HOA with a map showing the general area in which the well was likely located.  Three drilling contractors consulted by the HOA similarly expressed the opinion that the water was likely from an undestroyed well.  Moreover, the HOA initially took the same position:  In a June 2018 draft letter to the City, the HOA asserted that there was a well underneath the homeowners' unit, and in August 2018 the HOA rejected Ridley's proposal for a French drain because the drain would not address the suspected well.

13

Nevertheless, the HOA made little effort to locate the suspected well. It rejected a proposal to bring in a mini-excavator to dig into the crawlspace to search for the well, which would have required cutting a hole in the floor of the homeowners' unit. It also refused to take less costly measures. For example, although one of the drillers consulted by the HOA proposed to conduct historical research to better locate the well at a cost of $150 per hour, the HOA rejected the offer and instead Moritz did his own research (but located only one photograph). The HOA likewise rejected recommendations to search for the suspected well using ground penetrating radar, a magnetometer, or a metal detector.

In addition, in late 2018, the HOA adopted the position that the water in the crawlspace was not from an undestroyed well and stopped looking for such a well. The HOA had no basis for this decision. None of the HOA board members had experience dealing with wells; for example, Moritz, who took the lead on the issue, was a librarian for a laboratory, not an engineer. Although one drilling contractor mentioned alternative possibilities, no expert advised the HOA the water in the crawlspace was likely from a source besides an undestroyed well. In addition, the theory that the HOA adopted instead—that the water in the crawlspace was due to a high water table—was, in the opinion of a former Santa Clara County Water District official "crazy" because a high water table would have saturated the entire area, not just the crawlspace.

Moreover, the HOA did not reconsider its position in March 2019 after the crawlspace flooded and a plumber digging trenches around the perimeter of the homeowners' unit found no water. Nor did the HOA reconsider in June 2019 when Jim Toby, the civil engineer hired to design a French drain, informed the HOA that he believed the water in the crawlspace was likely from a well, or in September 2019 when a sinkhole was discovered in the crawlspace.

In fact, the HOA discovered the undestroyed well only by accident. The HOA failed to actively search for a well during 2018, and in January 2019, it stopped searching

14

for the well altogether. The well was only discovered in January 2020, 19 months after the original flooding of the crawlspace, when workers seeking to fill the sinkhole came upon a well cover.

Based on this evidence, the trial court had more than adequate grounds for finding that the HOA failed to conduct a reasonable investigation.

### 3. *The Remediation*

There is also substantial evidence that the HOA failed to repair the homeowners' unit in a timely fashion.

Early on, the HOA was advised of the danger posed by the water in the crawlspace and the need to act promptly. In May 2018 the HOA was advised that moisture was seeping into the unit, and the first law firm it retained warned of the "exponential costs" that might result if the problem was not swiftly addressed. Nevertheless, the HOA took no meaningful steps to mitigate the damage caused by the water in the crawlspace until the well was discovered by accident in January 2020. It is true that the HOA allowed Ridley to continue installing a sump pump. However, the HOA rejected the recommendation of its water restoration consultant to dry out the crawlspace. In addition, while the HOA decided to install a French drain to deal with the water in the crawlspace, it did not apply for a permit for the drain until August 2019, more than 15 months after receiving notice of water infiltration.

The HOA also failed to respond to damage in the homeowners' unit. In June 2018, an industrial hygienist informed the HOA that mold was developing in the unit and recommending remediation measures. By March 2019, mold was visible on kitchen cabinets and floors, and lab results showed elevated levels of mold in the master bedroom and bath. Accordingly, the HOA was told to dry out the crawlspace, clean the kitchen cabinet, and monitor moisture levels. However, the HOA did not timely implement these recommendations, and even by October 2023, it had not fully remediated the mold.

15

The HOA was similarly delinquent in dealing with the damage to the south wall. In 2010, Ridley informed the HOA that there were termites in the wall. However, other than fumigating the wall in 2016, the HOA did nothing to repair the termite damage before trial. Additionally, in March 2019, a board member noted rotting window trim on the wall, but the Board did not begin repairing the trim until April 2021, more than two years later.

This evidence provided ample basis for the trial court's finding that the HOA failed to remedy the water, mold, and termite damage in the homeowners' unit in a timely fashion.

### 4. *HOA's Arguments*

The HOA contends that there was insufficient evidence of breach because the expert on condominium practice presented by the homeowners testified that he did not rely on the standard of maintenance prevalent in the neighborhood. This contention is based on the provision in the CCRs requiring the HOA to manage, maintain, and repair common areas, facilities, improvements and landscaping "to the standard of maintenance prevalent in the neighborhood." This reference to the neighborhood standard does not help the HOA because it concerns the level to which the common areas must be maintained. By contrast, the homeowners' claim is based the standards of care for investigating and remediating damage. The homeowners' expert testified to the standard of care observed by an ordinarily prudent condominium board with respect to investigating and remediating damages.

In any event, there was evidence that homes in the neighborhood did not have pools of water on the ground, which shows the prevalent standard of maintenance relevant to the water in the crawlspace under the homeowners' unit. Thus, even if the homeowners were required to show that the HOA failed to meet the standard prevailing in the community in investigating and repairing, there was substantial evidence supporting the trial court's finding that the homeowners satisfied that burden.

16

The HOA also asserts that nothing in the CCRs required it "to rely on certain experts." While that may be true, the trial court did not interpret the CCRs to require the HOA to rely on any particular expert. Instead, in finding that the HOA failed to conduct a reasonable investigation into the water intrusion, the trial court noted that the HOA ignored the opinions of all the drilling contractors it consulted, the City, the Water District, and the civil engineer it hired to construct the French drain that there was likely an undestroyed well under the crawlspace. While the HOA asserts that it was reasonable to reject several specific recommendations and to delay remediation of some items, it does not—and cannot—argue that the trial court lacked a solid basis for finding that the HOA failed to conduct a reasonable investigation.

Finally, the HOA asserts that the trial court rewrote the CCRs to require the HOA to perform maintenance within a specific time frame. We disagree. Far from adopting a specific deadline, the trial court recognized that the CCRs "do[] not provide a specific time that something has to be done" and that therefore repairs had to be done "in a reasonable time." However, the court concluded that the HOA did not make repairs within a reasonable time because the homeowners' unit remained in an unlivable condition six years after the initial water intrusion in the crawlspace, not because it failed to meet any specific deadline. In reaching this conclusion, the trial court observed that the CCRs required homeowners to begin repairs within 60 days of the damage to be prepared. However, the trial court did so only to provide guidance on what constitutes a reasonable time for repairs, not to impose a specific deadline.

We therefore conclude that the trial court's finding that the HOA breached the CCRs is supported by substantial evidence.

## B. The Business Judgment Rule and Rule of Judicial Deference Defenses

The HOA also challenges the trial court's rejection of its rule of judicial deference and business judgment rule defenses. We are not persuaded. The trial court rejected

these defenses based on well-supported findings that the HOA failed to conduct a reasonable investigation and did not act in good faith.

Condominium boards are protected by the rule of judicial deference adopted by the Supreme Court in *Lamden v. La Jolla Shores Clubdominium Homeowners Association* (1999) 21 Cal.4th 249 (*Lamden*). Under this rule, decisions by condominium boards concerning maintenance and repair of common areas are entitled to judicial deference if, among other things, they are made upon reasonable investigation and in good faith: "[W]here a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant development statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." (*Id*. at p. 265.)

The HOA is also protected by the business judgment rule. Although the business judgment rule does not apply to all condominium associations (*Lamden*, *supra*, 21 Cal.4th at p. 259), it applies here because the HOA is incorporated. Much like the rule of judicial deference, the business judgment rule creates a presumption that decisions by corporate directors are based on sound business judgment and " 'prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest.' " (*Lauckhart v. El Macero Homeowners Assn*. (2023) 92 Cal.App.5th 889, 906 (*Lauckhart*).)

Both the rule of judicial deference and the business judgment rule are affirmative defenses. (*Affan v. Portofino Cove Homeowners Assn*. (2010) 189 Cal.App.4th 930, 940 (*Affan*) [rule of judicial deference]; *Ekstrom v. Marquesa at Monarch Beach Homeowners Assn*. (2008) 168 Cal.App.4th 1111, 1123.) As a consequence, defendants invoking these rules bear the burden of establishing the requirements for their application. (*Affan*, at p. 940.) Moreover, where, as here, the trial court found that the

18

defendant failed to satisfy that burden, the issue on appeal is " 'whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.) To demonstrate that a finding is compelled, a defendant must show that the evidence supporting that finding was " '(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid*.)

The trial court held the rule of judicial deference inapplicable because it found that the HOA did not conduct a reasonable investigation. As shown above, substantial evidence supports this finding. The HOA was on notice in the spring of 2018 that the City and the Water District believed the water in the crawlspace might be from an undestroyed well, and all three of the drilling contractors that the HOA consulted agreed there was likely such a well. Nonetheless, the HOA decided without any advice, expertise, or evidence that there was no well and stopped investigating the possibility. Moreover, the HOA refused to reconsider this decision in spite of additional flooding, the trenches that they dug, the sinkhole that developed, and their civil engineer's advice. As a consequence, the well underneath the homeowners' unit was discovered only by accident in January 2020. In challenging the trial court's finding that it failed to conduct a reasonable investigation, the HOA ignores this evidence and asserts that it "weighed competing interests" and "at times conflicting expert opinions." However, those considerations do not undermine the evidence upon which the trial court concluded that the HOA failed to conduct a reasonable investigation, much less compel the conclusion that the HOA's investigation was reasonable.

The trial court also found that the HOA did not act in good faith in refusing to search for a well or remediate the homeowners' unit. This finding is also well supported. As just noted, the HOA ignored the opinions of the City, the Water District, and its drilling contractors without any colorable basis, and it decided without any expert advice

to pursue a remedy—the French drain—that it had rejected earlier as not adequately addressing the undestroyed well.

Moreover, the HOA tried to manipulate other experts into supporting this remedy by not informing them of the possibility of a well. In December 2018, the HOA's lawyer Stephan Barber contacted two hydrologists and obtained a preliminary recommendation for a French drain but failed to disclose to the hydrologists that the water in the crawlspace might be from an undestroyed well. Then, the HOA tried to use that preliminary analysis and other misrepresentations to persuade the City and the Water District to support the French drain. Barber wrote the City and the Water District that "no qualified expert with whom we have consulted gives any credence to the hypothesis that there is an abandoned artesian well" under the homeowners' unit and that "[t]he consensus is that there is a high groundwater table with an abundance of water" under the condominium complex. In fact, Barber was personally present when one of the drilling contractors consulted by the HOA stated that, while the water might be coming from an underground spring or a high groundwater table, a well below the homeowners' unit was the probable source. In addition, as previously noted, at the time that the HOA made this decision no expert had advised it that the water in the crawlspace was likely due to a high water table, and the hydrologist who Barber suggested supported this contention testified that he was "angry" and "shocked" by Barber's letter suggesting that he supported this position.

The conclusion that the HOA did not act in good faith is reinforced by other evidence of bad faith. *First*, Moritz repeated the misstatements in Barber's letter to Ridley, to the association's membership, and to the courts. Although Moritz admitted to the trial judge that at the time he believed the water in the crawlspace was from a well, he forwarded Barber's letter to Ridley, and he stated that "[n]one of the experts consulted give credence to the hypothesis postulated by the [relevant government authorities] that an abandoned well exists." In addition, when the homeowners sued the HOA, Moritz

20

told the association's membership that the water underneath the homeowners' unit was likely due to a high water table. And when the homeowners sought a temporary restraining order, Moritz submitted a declaration stating that "[t]he HOA has since determined that the most likely cause of the water is a high ground water table under the subject property."

*Second*, the HOA acted in bad faith towards the homeowners. In July 2018, it formed a well committee and appointed Ridley to the committee. Moritz assured Ridley that he would be involved in all the committee's discussions about the water problem under his unit. However, as Moritz admitted at trial, this statement was false and was made only to placate Ridley. Indeed, almost immediately after Ridley joined the well committee, Ridley was excluded from committee communications. For example, on July 30, 2018, after Ridely raised questions to the committee about mold, the HOA's manager removed Ridley from the email chain and asked other committee members for their views on how to respond to Ridley. That same day, another committee member distributed mold test results without copying Ridley. And committee members excluded Ridley from an email concerning insurance coverage and the retention of Barber.

*Third*, the HOA acted without regard to the health and safety of others. For example, in December 2018, without expert advice, Moritz told the homeowners that their unit was habitable and should be rented. Even worse, the HOA sent a contractor to remove the topsoil and fill the sinkhole without telling them that there might be an undestroyed well there. However, as one of the drilling contractors testified, a well like the one found underneath the crawlspace can flow at 500,000 gallons a minute, and if the soil on top of the well is removed and there is no longer any pressure holding the well cap down, water can shoot up like a fire hydrant run over by a car. Accordingly, the trial court found that Mortiz's failure to disclose the possible presence of a well put workers at risk.

21

The HOA asserts that the trial court's focus on the Barber letter and Moritz's adoption of statements in the letter is "misplaced" because the letter "must be viewed within the context of HOA's consultation with experts, the weighing of costs, the potential for destroying the unit, and the fact that Ridley had initially proposed the French drain." However, the HOA does not explain how its consultation with experts, most of whom it ignored, establishes that it acted in good faith. Nor does the HOA explain how any of the factors identified compels the conclusion that it acted in good faith when it made multiple false and misleading statements in support of a solution that it adopted without any colorable basis.

The HOA also asserts that Barber's statements stemmed from uncertainty over the location of the suspected well and reflected his belief that a French drain was the best solution. However, Mortiz admitted that, when the HOA made the decision to install a French drain in January 2019, no expert had recommended installing such a drain. In addition, Barber's letter to the City did not merely assert that the location of the undestroyed well was uncertain: In direct contradiction to all the drilling contractors consulted by the HOA, the letter stated that no expert believed that that there was a well "under or *near*" the unit, and that the consensus was that the water in the crawlspace was due to the "crazy" hypothesis of a "high groundwater table." (Italics added.) The HOA also asserts that that Barber was merely advocating on behalf of his client, but it fails to explain how that fact relieves the HOA of responsibility for the misstatements made on its behalf, much less suggests the HOA was acting in good faith.

In its reply, the HOA notes Moritz's testimony that he believed that the statements in Barber's letter were true when they were made. However, the trial court—which specifically questioned Moritz about these beliefs—found that this testimony was not credible and that the HOA engaged in a pattern of "falsehood" and "deception." As appellate courts " 'defer to the trier of fact on issues of credibility' " (*Greisman v. FCA*

22

*US, LLC* (2024) 103 Cal.App.5th 1310, 1322), the trial court's rejection of Moritz's testimony on this point must be respected.

Other explanations offered by the HOA fail for the same reason. For example, the HOA's attempts to defend Barber's failure to disclose the suspected well to the hydrologists by pointing to Barber's testimony that he did not want to influence their opinions. The trial court found this explanation implausible and "pretextual," another credibility assessment that must be respected. Similarly, while the HOA asserts that Ridley's exclusion from well committee communications "shows at most a lack of communication," the trial court disagreed, inferring that Ridley's exclusion was intentional and the promise to include him pretextual.

Finally, the HOA objects that it engaged in "active decision making" concerning the water intrusion under the homeowners' unit and resulting repairs and that the trial court engaged in impermissible "second-guessing" and "micromanaging" of these discretionary decisions. This objection begs the question. Under the rule of judicial deference and the business judgment rule, courts are required to defer to the discretionary decision making of a homeowner's board only if the board acted in good faith. (See, e.g., *Lamden*, *supra*, 21 Cal.4th at p. 257; *Lauckhart*, *supra*, 92 Cal.App.5th at p. 906.) Moreover, while the HOA points to some actions that it took in good faith, such as investigating whether there was an undestroyed well in the spring, summer, and fall of 2018, and to its repair efforts after the inadvertent discovery of the well in January 2020, the trial court found that the HOA acted in bad faith based on its conduct in late 2018 and throughout 2019.

We therefore conclude that substantial evidence supports the trial court's findings that the HOA failed to conduct a reasonable investigation and acted in bad faith, and therefore the trial court properly rejected the HOA's rule of judicial deference and business judgment rule defenses. In light of this conclusion, we need not consider the alternative grounds on which the trial court rejected these defenses.

The HOA also challenges the trial court's rejection of its defense under the CCRs' exculpatory clause. The court rejected this defense on three alternative grounds: The clause does not apply because the claimed damage was caused by the HOA's neglect, because the clause is against public policy and unenforceable, and because the HOA was grossly negligent. The HOA challenges each of these rulings. We need address only gross negligence.

" 'Gross negligence' long has been defined in California and other jurisdictions as either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.) Thus, gross negligence may be proven in two different ways. (*Davis v. Physicians Assistant Board* (2021) 66 Cal.App.5th 227, 239-240.) First, a defendant is grossly negligent if it exercises "so slight a degree of care as to raise a presumption of conscious indifference to the consequences" as, for example, where a person's state of mind is " 'simply, "I don't care what happens." ' " (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036.) Second, a defendant is grossly negligent if its conduct constitutes " 'an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others.' " (*Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC* (2024) 99 Cal.App.5th 44, 56.)

The trial court found both an extreme departure by the HOA from the ordinary standard of care and an indifference towards the consequences of its conduct. Both findings are supported by substantial evidence.

There was ample evidence of an extreme departure from the ordinary standard of care. As noted above, the HOA was informed in May 2018 that the City believed that the water in the crawlspace was likely from an undestroyed well that had to be located and destroyed, and all three drilling contractors consulted by the HOA expressed the same opinion. Nevertheless, the HOA rejected these opinions and, without any expert advice, decided that there was no well and took the "crazy" position that the water in the

24

crawlspace was from a high groundwater table. In addition, the HOA maintained this position in the face of evidence—flooding in March 2019, the absence of water in the trenches dug near the unit, and the sinkhole found in September 2019—that the water in the crawlspace was not from a high groundwater table. Finally, rather than trying to determine the true source of the water in the crawlspace and the best remedy for it, the HOA tried to manipulate the opinions of the hydrologists it consulted by not disclosing the potential well and then misrepresented the opinions it had received to the City, the Water District, its membership, and the courts. This record provides substantial evidence that the HOA's conduct constituted an extreme departure from what a reasonably careful person would do.

There also was substantial evidence that the HOA acted with indifference to the dangerous consequences of its conduct. For example, as early as May 2018, the HOA was informed of the "exponential" loss that might occur if it did not address quickly the water in the crawlspace. Two months later, an industrial hygienist informed the HOA that mold was developing in the homeowners' unit, and by March 2019 mold was visible on kitchen cabinets and floors. Nevertheless, the HOA took no meaningful action to remove the water in the crawlspace until discovery of the well in January 2020 and before then asserted without basis that the homeowners' unit was habitable, despite the danger that some of the mold in the unit was toxic—as it turned out to be. In addition, the HOA sent workers to dig out the sinkhole without informing them that they might be removing the soil above an undestroyed well, despite the danger of an explosion when the soil was removed. This evidence provided ample basis for finding that the HOA was indifferent not only to the property damage that its inaction could cause, but also to the health of tenants and the physical safety of workers.

In its opening brief, the HOA did not attempt to explain why this evidence was insufficient to show gross negligence. The HOA merely asserted that it never disclaimed responsibility and took multiple steps to resolve the water intrusion, mold, and damage to

25

the south wall.  While that is true, the HOA was nonetheless grossly negligent in deciding without any reasonable basis to ignore the opinions of the City, the Water District, and its drilling contractors that there was a well and also for delaying 19 months before taking any meaningful action to remedy or reduce the damage to the homeowners' unit.

In its reply brief, the HOA asserts that it "had reasons for its maintenance decisions" and that the false and misleading statements by Barber and Moritz "reflected the HOA's belief that the best approach at the time was to proceed with a French drain." However, the HOA fails to explain why the trial court could not find the HOA grossly negligent based on the contrary evidence in the record.  (See *City of Bonaventure v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 120 [" ' "As a general rule," ' " appellate courts " ' "will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." ' "].)  The HOA also asserts that, at the time that it sent workers into the sinkhole, there was no evidence that there was a well directly underneath the unit.  In fact, while there was no definitive evidence of the location of the well, as has been repeatedly noted, the HOA was informed by all three drilling contractors that it consulted that an undestroyed well was likely either under the crawlspace or just outside the rear foundation.  Finally, in attempting to defend Moritz's insistence that the homeowners' unit was habitable, the HOA notes that Ridley rented out the unit in October 2018.  However, the HOA fails to acknowledge Ridley had a mold test done *after* the tenant in question moved out, and that this test, which Ridley shared with the HOA, showed that mold was present.

In short, the HOA has not shown any error in the trial court's finding of gross negligence.  We therefore affirm the court's rejection of the HOA's exculpatory clause defense and, because the court's finding of breach is otherwise justified, we affirm the determination that the HOA breached the CCRs and the injunction issued based upon that breach.

### III. DISPOSITION

The injunction order issued July 25, 2024 is affirmed. Respondents are entitled to recover costs on appeal. (Cal Rules of Court, rule 8.278(a)(1), (3).)

_____
BROMBERG, J.

WE CONCUR:

_____
DANNER, ACTING P. J.

_____
WILSON, J.

*Ridley et al. v. Rancho Palma Grande Homeowners Association*
H052560

Filed 9/25/25

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOUG RIDLEY et al., <br><br>     Plaintiffs and Respondents, <br><br>     v. <br><br> RANCHO PALMA GRANDE HOMEOWNERS ASSOCIATION et al., <br><br>     Defendants and Appellants. | H052560 <br> (Santa Clara County <br>  Super. Ct. No. 19CV349909) <br><br> ORDER MODIFYING OPINION AND GRANTING PUBLICATION <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on August 28, 2025, is modified as follows:

1. On page one, line four the word "Grade" is changed to "Grande" so that the sentence reads:

   Because this crawlspace is a common area controlled by the homeowners' association, Rancho Palma Grande Homeowners Association (HOA), rather than the homeowners, was responsible for the investigating and remedying the water intrusion.

2. On page 17, second full paragraph, line 10, the word "prepared" is changed to "repaired" so the sentence reads:

   In reaching this conclusion, the trial court observed that the CCRs required homeowners to begin repairs within 60 days of the damage to be repaired.

3. On page 22, second full paragraph, line 12, the words "how the fact" are inserted between the words "less" and "suggests" so that the sentence reads:

   The HOA also asserts that Barber was merely advocating on behalf of his client, but fails to explain how the fact relieves the HOA of responsibility for the misstatements made on its behalf, much less how the fact suggests that the HOA was acting in good faith.

There is no change in judgment.

The opinion in the above-entitled matter filed on August 28, 2025, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

_____
BROMBERG, J.

_____
DANNER, ACTING P. J.

_____
WILSON, J.

*Ridley et al. v. Rancho Palma Grande Homeowners Association et al.*
H052560

2

| Trial Court: | Santa Clara County Superior Court |
| Superior Court No.: | 19CV349909 |

Trial Judge:           The Honorable Joanne McCracken

Attorneys for Defendants and Appellants     Horvitz & Levy
Rancho Palma Grande Homeowners
Association et al.                            Andrea M. Gauthier
                                           Scott P. Dixler

                                           Sims, Lawrence & Broghammer

                                           Bobby Dale Sims, Jr.
                                           John T. Hill

Attorneys for Plaintiffs and Respondents    O'Hara Creech
Doug Ridley et al.:
                                           Terence J. O'Hara
                                           Mary Ann O'Hara

*Ridley et al. v. Rancho Palma Grande Homeowners Association et al.*
H052560